## 16093. SOVEREIGN CAMP WOODMEN OF THE WORLD *v.* SIMMONS.

Where in an action upon an insurance policy the jury finds against a plea of suicide, and a contrary finding is not demanded by all the facts and circumstances, with all reasonable deductions and inferences therefrom, this court will not set aside the verdict.

DECIDED MARCH 3, 1925.

Complaint; from city court of Albany—Judge Clayton Jones. November 22, 1924.

Application for certiorari was denied by the Supreme Court.

*Kline & Moore,* for plaintiff in error.

*R. E. L. Spence Jr.,* contra.

Luke, J. This is an action upon a certificate of insurance issued by the defendant, the Sovereign Camp of the Woodmen of the World, to Edgar J. Simmons, the husband of the plaintiff. The certificate contained the following stipulation: "If the member holding this certificate should die by his own hand or act, whether sane or insane, the certificate shall be null and void and of no effect." The only portion of the defendant's answer material to the decision of this case is as follows: "Defendant further shows that said Edgar J. Simmons, the holder of said certificate of insurance, died by his own act or hand; that is, he committed suicide on July 10, 1923, which act on his part violated the provisions of said certificate herein above set out." The verdict was for the plaintiff. The defendant's motion for a new trial was overruled, and it excepted.

Taken as a whole the charge of the court was full and fair, and the criticisms of excerpts from it are not meritorious. The sole remaining and controlling question is whether the jury's verdict can stand under the evidence.

The evidence may be summarized as follows: The insured was found dead in a store run by him on Pine street, near the limits of the city of Albany, Georgia, on July 10, 1923. He had been dead at least half an hour before seen by any witness testifying. The store was a frame building about sixteen by forty feet, located near the highway. He was found lying on his back on the floor near the front of the store, with his head towards the front door, his feet towards the rear door, his right foot under his left, and his hands by his side. The front door was barred and the back-door open. A thirty-eight-caliber hammerless pistol, with one of the shells fired, was lying on the floor, to his right and near his head. There was a bullet wound through his right temple, and blood about the wound. The bullet passed entirely through his head, coming out on the left side and going through the front glass of a show-case about the height of the head of a man sitting on the floor. The bullet appeared to be "rising the least bit" when it went through the other side of the show-case. A witness swore: "I found the bullet there two or three days afterward." It

was so bruised that the witness could not tell what caliber it was. A witness testified that it would have been impossible for the man to have been standing when he was shot, and that it appeared that he would have had to be sitting down. Dr. Loot testified that "there were powder burns around where the ball entered the head, indicating that he had been shot at close range." Two other witnesses, one who helped dress the deceased, and another who assisted in washing the body, swore that they saw no powder burns,—one testifying that he thought he would have seen them if there had been any, and the other that he would have seen them had there been any. Another witness, who saw the body about an hour after the shooting, swore that he examined the store and found nothing unusual, nothing to indicate burglary, or a fight, or scuffle. There was a large break in the show-case. "If a bullet is going straight and rapidly it would make a small hole; if slowly and at an angle, a larger hole." As to the ownership of the pistol a witness for plaintiff swore: "I swapped the pistol for another pistol and turned it over to Mrs. Simmons. I made the trade because she did not care to have that pistol any longer, and wanted to get rid of the pistol. I do not know whether the pistol belonged to Mr. Simmons. Mrs. Simmons said she did not want the pistol any longer, and asked me to trade it off for her. I do not know whether the pistol was hers or his." Dr. Barnett had known the deceased very well for twelve years, and treated him off and on for about fifteen years, but for no serious illness, his trouble having been malaria, cold, and grippe. The deceased was a hard-working man, attended to his own business, and always paid his debts. He would take a drink, but witness had never seen him drunk. He had never treated the deceased for nervousness, and knew of nothing "interfering with" his health. Another witness, who lived near the deceased, testified that he appeared to be all right the morning before his death, that he had recently complained of having high blood pressure, that he took him to a doctor a few days before his death, and that he seemed to feel that the doctor was doing him good. Dr. Cook had treated the deceased for alcoholism. His physical condition was good. He had seen the deceased when he had had drinks for four or five days. Sometimes he would be limp in bed. He gave him hypodermics, and emptied his stomach four or five times; had seen him when he was so prostrated he couldn't

walk, and "his mind would be affected the same as his body." He was likely to do anything, could not be responsible for what he did. The doctor had treated him perhaps six or seven times during three or four years. He treated him the morning before the night of his death, and suggested that he ought to be in the hospital. In his condition the deceased was likely to do anything, likely to kill his wife, his children, or himself. Dr. Cook further swore that he had "turned Mr. Simmons loose about thirty-six hours before he died," and that he did not know his condition the afternoon before he died. The deceased was asleep when he left him. It sometimes takes a patient in his condition a week or ten days to become normal. He was in a chronic alcoholic condition. Mr. Tift had known the deceased several years, and had sold him goods from time to time. He saw deceased on the day of his death. He was sick, was complaining of not feeling well, but did not know what his trouble was. He took the deceased for a long ride the afternoon before his death, because he thought it would make him feel better. The deceased was not able to attend to his business. They returned from the ride about an hour before dark, after being together practically the entire afternoon. Witness knew the deceased was a sick man. He complained of his stomach. He thought the deceased was feeling a great deal better when he left him. He was much more cheerful and in better spirits than at any other time during the day. The deceased did not show any symptoms of drinking, and was not sick enough to require the services of a physician. The verdict of the coroner's jury was that the deceased came to his death by his own hand. The evidence in this case indicates that the insured died at about half-past seven o'clock p. m.

Certainly the evidence in this case would have amply sustained a verdict for the insurer, but the jury found otherwise. The question for this court to determine is not which way the weight of the evidence leaned, but whether the facts and circumstances proved, with all reasonable deductions and inferences therefrom, absolutely demanded a finding in favor of defendant's plea of suicide. We can not say that they do. It was night, and at least half an hour elapsed before any witness saw the dead body of the insured. The evidence was contradictory as to whether or not there were powder burns on the body, and there was evidence from which the jury

might have concluded that motive for suicide was not clearly shown. The law controlling this case will be found in *New York Life Ins. Co.* v. *King,* 28 *Ga. App.* 607 (112 S. E. 383), and *Hodnett* v. *Ætna Life Ins. Co.,* 17 *Ga. App.* 538 (87 S. E. 813). The facts in those cases differentiate them from the case at bar.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*