25313.   PEPPERS *v.* SOVEREIGN CAMP W. O. W.

DECIDED JULY 16, 1936.

D. S. Strickland, Burress & Dillard, for plaintiff.

Little, Powell, Reid & Goldstein, James H. Therrell, Sidney Smith, R. H. Hutcheson, for defendant.

MACINTYRE, J.   Mrs. Maggie Peppers brought suit against the defendant, a fraternal-insurance order, on a policy of insurance on the life of her husband, in which she was named as beneficiary. The defendant admitted the death of the insured, and that proper proofs of loss had been submitted, but alleged that the policy had not been in effect two years, that it was provided in the policy that "in event of death by my own hand or act within two years from the date of the certificate, all right and benefits which may have accrued on account thereof shall be absolutely forfeited," and that the insured intentionally came to his death by his own hand. The parties agree that the questions to be decided by this court are whether, under the pleadings and the evidence, any issue of fact was raised for determination by the jury, and whether at the conclusion of the evidence the court erred in directing a verdict for the defendant.

The plaintiff testified that she had been married to the insured twenty-four years, and that he had never had any sickness and was in good health, and had never threatened to kill himself. Several witnesses testified they saw and talked with the insured on the

morning before his death, which occurred between two and three o'clock that afternoon; and that he "was jolly and laughing," as was his custom. A blacksmith testified that the insured brought a mattock to his shop about nine o'clock on the morning of his death and had it sharpened and got it between eleven and twelve o'clock that day. He was perfectly normal, and told the blacksmith: "I am fixing to go home and go to digging in my bermuda grass, and you know that's hard work," and that day he was jolly just like he always was, laughing and talking. Another witness testified that the insured helped him work on his car on the morning before he was killed, and he promised the insured if he got the car fixed in time he would take the insured to Atlanta with him. Rilla Bishop, daughter, testified she was visiting at her father's home on the day he died. "I was sitting on the front porch when he came upon the porch, and he had a mattock in his hand that he taken to the shop and had sharpened, and he was going to use it in the garden, and he sat down on the banisters in front of me, teasing me and joking me and going on. . . He laid it down at my feet, and said 'Now you can use it.' I talked with him in the house, and he teased me all the morning. I was cutting out a dress after I went into the house, and he would come to the table where I was and pull the cloth and aggravate me, you know, teasing me like that; and after I taken the cloth to the machine to sew, he stopped the machine and would not let me sew until he got some oil and oiled up the machine. He was on the bed in the room when he was shot; it was somewhere between two and three o'clock. Mama and myself were in the room. He was there on the foot of the bed. I had seen him from noontime that day. He had been around the house. . . He would go out and come in laughing and talking all the time." At the time he shot himself he had been in the room, "I estimate, about fifteen minutes. . . He was talking about his birthday dinner (this was Monday, and his birthday was Friday), and we was going to have a fish-fry for supper, and he was telling me he was going to my uncle's the next week. About his shooting, well, he just looked up at me and says, 'Rilla, do you want me to show you something?' and I looked. I didn't say nothing, and he asked again, and he reached under his pillow. The second time I don't remember whether I said anything or not. He reached under his pillow and got his

pistol out and brought it around, waved it around [indicating]. He pointed it toward me and mother before it got to him. When it got to him it fired. When this happened he was on the foot of the bed. When he was waving it around, I don't think it stopped; the best I remember it did not stop. As to what I mean, it did not stop; when he brought it around, it fired, and he just fell back on the bed." He always kept his pistol under the pillow next to the mattress. "I was sitting at the machine; it was out kinder in front of the foot of the bed. Mother was sitting at the foot." The plaintiff, testified: "I was sitting in my chair with a magazine. I had been reading. I was sitting at the foot of the bed, and a little over to the right was a machine, and Rilla was sewing. She was there at the machine. . . It was after the midday meal. Mr. Peppers came in and sat down on the bed. I don't remember how long he had been here. We was all laughing and talking. While he was sitting on the bed he said to Rilla, 'Rilla, do you want me to show you something?' And he reached under the pillow and picked up his pistol and made a sweep with it like this [indicating], and when it got up there in two or three inches of his head I heard the shot. I don't remember all my husband had been doing that day. He came up town and bought a mattock and had it sharpened, and was going to do some gardening that evening. . . Rilla was sitting on the porch, . . and he brought it and laid it down at her feet and told her to take it and go to work. He was joking with her, for he was going to work with it himself after dinner. . . He and Rilla had been joking right smart during the morning. She would be sewing, and he would be around and pull the cloth out of her hands, and sometimes he would unthread the machine, teasing her. He teased at me. . . Every time he was around he would be picking at me and the rest of the children too. . . He was talking about his birthday, . . was going to have a big birthday dinner and fish-fry. His birthday was Friday. He didn't have a regular job. . . He worked at carpenter work. . . Three of the family worked in the cotton-mill. Mr. Peppers did not owe any bills that I know of. We were getting along all right. Mr. Peppers and I had no domestic troubles prior to that time, . . seems like he was getting along fine, he was laughing and talking." The pistol was a self-acting pistol, discharged by pulling

the trigger, and was "very easy on the trigger," easier than the ordinary pistol. The defendant introduced evidence that some months before his death the insured had been treated by a physician. The court directed a verdict for the defendant.

This case is unique on its facts. Most of the reported cases develop the fact that the death took place while the insured was alone, and circumstances had to be relied on to determine whether the killing was self-inflicted or whether it was accidental. In the present case it becomes a question as to whether the self-inflicted wound was accidental or intentional. In 6 Couch on Insurance, § 1262(r) it is said: "Primarily the question whether a death was the result of suicide is not one of science or legal knowledge, but a question of fact to be determined as such, and in view of the circumstances of fact attending it; and each case must therefore stand largely on its own particular facts and circumstances. . . Generally speaking, the rule is that if the evidence is so clear and convincing that it can be said that all reasonable men would draw the same conclusion therefrom, then the question is one for the court; in other words where the evidence produced clearly overcomes the presumption against suicide, convincingly indicates suicide, and is inconsistent with any other hypothesis than that of self-destruction, the insurer is entitled to a directed verdict on the defense of suicide. . . Where the evidence is not so conclusive as to overcome the presumption against suicide, but leaves a reasonable basis for an inference other than that of self-destruction, the question is one for the jury." In *Gem City Life Insurance Co.* v. *Stripling,* 176 *Ga.* 288, 290 (168 S. E. 20), it was said "Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide, the theory of accident rather than suicide is to be adopted." This presumption against suicide will vanish only upon proof of physical facts clearly inconsistent therewith. In Ætna Life Insurance Co. *v.* Kent, 73 Fed. (2d) 685, it was said: "Whether insured, who was allegedly killed by accidental means when he placed pistol against head and pulled trigger, should in exercise of ordinary care have known that undischarged cartridge was in pistol, held for jury." In that case Kent, the insured, was demonstrating how a certain suicide had taken place. He placed a pistol to his head, and was warned that it might be loaded. He replied, "It

isn't loaded," and pulled the trigger, causing his death. This principle was laid down: "Where an injury is the result of a voluntary act in the performance of which there was a 'slip or mishap,' it is to be regarded as having been caused by accidental means." And the means are accidental if the doer of the voluntary act was ignorant of a material fact or circumstance which would have caused him to act differently had he known it. See O'Connor *v.* Modern Woodmen of America, 110 Minn. 18 (124 N. W. 454, 25 L. R. A. (N. S.) 1244); Supreme Lodge K. of P. *v.* Beck, 181 U. S. 49 (21 Sup. Ct. 532, 45 L. ed. 741). A wound may be self-inflicted and yet accidental. Motive is always involved in matters of this kind. In *Freeman* v. *Metropolitan Life Insurance Co., 35 Ga. App.* 770 (4) (134 S. E. 639), it was said: "Whether the death of the insured, if caused by his own hand, was inflicted with suicidal intent, involved an inquiry into the insured's state of mind at the time of death."

The defendant contends, that, irrespectively of the state of mind, the evidence shows that the insured took the pistol in his hand, placed it to his head, and pulled the trigger; that this fact is undisputed; and that no verdict other than the one directed could legally have been rendered. There have been many deaths in this State caused by one person aiming a pistol or gun at another and pulling the trigger, and death ensued, and yet the perpetrator of the act contended that he had no intention of shooting. In the present case, if when the insured waved the pistol around and pointed it at either his daughter or his wife, it had exploded and death ensued, a verdict of guilty of murder would not have been demanded. Involuntary manslaughter might also have been involved. The act of the defendant, if unintentional, was foolish to a degree; and yet we are not prepared to say, in view of the evidence (which might have been believed by the jury) that there was no cause for his taking his life, his evident preparation to continue his life, and the "jolly mood" he was in that day, together with his playful conduct in the presence of his wife and daughter, that his killing was suicide rather than accidental, or that the evidence is so clear and convincing that all reasonable men would or could draw but the one conclusion of suicide. When it comes to determining human conduct and saying that a certain action can be construed as being motivated by one certain purpose and no

other, we are loath to assume a judicial legal interpretation thereof, but prefer to leave such a question to the alchemists of the facts as applied to the law—the jury. We think the matter was one not free of doubt and inconsistent with any interpretation other than suicide, and that it should have been left for a determination by the jury.

It should be borne in mind that this is not a suit on a policy of accident insurance, in which case it has been held that the burden is on the plaintiff to show the accident; or, to put it a little differently, the burden should not be put on the defendant to show that the death was not accident but suicidal; or, to put it still a little differently, the plaintiff, under such a policy, must plead accident as set forth in the policy, and then prove it. See Fidelity & Casualty Co. *v.* Driver, 79 Fed. (2d) 713. But in the instant case the policy is one of life insurance, and the contention of the insurer that the death was suicide is the assertion of an exception, which the defendant has the burden of pleading and proving, and is only another way of saying the death was not accidental. *Gem City Life Insurance Co.* v. *Stripling,* and Fidelity & Casualty Co. *v.* Driver, supra.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*