25982. JEFFERSON STANDARD LIFE INSURANCE
COMPANY *v.* BENTLEY.

DECIDED FEBRUARY 20, 1937.

*Bryan, Middlebrooks & Carter, John A. Dunaway,* for plaintiff in error.

*T. J. Lewis,* contra.

GUERRY, J. Mrs. Elaine Neese Bentley filed suit against the Jefferson Standard Life Insurance Company, upon an ordinary-life policy issued on the life of plaintiff's son, William Daniel Bentley. It provided for the payment of $1000 in a specified way, "immediately upon receipt of due proof of death of the insured," and further provided in this connection that "in the case of self-destruction committed, whether sane or insane, within two full years from the date hereof, the extent of recovery hereunder shall be the premiums paid." In consideration of an additional premium paid by the insured, the policy further provided that if death "results from bodily injuries effected directly and independently of all other cause through external, violent, and accidental means, where . . there is a visible contusion or wound on the exterior of the body, and which independently and exclusively of all other causes result in the death of insured within ninety days from the date of accident," an additional $1000 would be paid by the company, but provided in this same connection that "these provisions do not apply . . in case death results from . . self-destruction or any attempt thereat, whether sane or insane." The petition alleged that "on or about the 10th day of February, 1936, . . William Daniel Bentley was accidentally killed by a gunshot wound, to wit, a pistol wound in his left chest; that deceased at the time of his death was alone in an upstairs room of the home; that the windows of said room were closed; that there were only five other persons in the house at said time, besides deceased, three · besides deceased being upstairs; that the

pistol or gun with which deceased was killed was accidentally discharged, the bullet entering his left chest, causing almost instant death; that the pistol with which deceased was shot was found lying on his bed, four bullets having been removed therefrom which were also lying on the bed, and deceased had removed his shirt preparatory to retiring; that the death of insured resulted from bodily injuries effected directly and independently of all other causes through external, violent, and accidental means, there being a visible contusion or wound on the exterior of insured's body on the left side near his heart, which independently and exclusively of all other causes resulted in the death of the insured almost immediately and within ninety days of the accident; nor was his death the result of the criminal act of a third person, nor intentional act of his own."

The defendant filed a demurrer and an answer. The demurrer was substantially: (1) The allegation that deceased was accidentally killed by a gunshot wound etc., was a conclusion of the pleader and "does not show in what manner said insured was accidentally killed." (2) It does not appear in the petition "whether insured shot himself or whether he was shot by another." (3) The allegation, "nor was his death the result of a criminal act of a third person, nor intentional act of his own," is a conclusion of the pleader. The answer denied liability, (1) because within two years from the date of the policy the insured "destroyed himself by shooting himself through his heart with a pistol;" (2) because the insured made material false representations in the application on which the policy was issued, in that in answer to a question therein he stated he had not within the five years immediately preceding the date of the application, used alcoholic stimulants, on which representation the insurer relied and issued the policy. The demurrers were overruled. Issue was joined, and the trial resulted in a verdict for the plaintiff. Exceptions are to the overruling of the defendant's motion for new trial, and to the overruling of the demurrers.

The plaintiff's petition alleged: "5. That on or about the 10th of February, 1936, . . the insured . . was accidentally killed by a gunshot wound, to wit, a pistol wound in his left chest, that deceased at the time of his death was alone in an upstairs room of the home, that the windows of said room were closed,

that there were only five other persons in the house at said time, besides deceased, three besides deceased being upstairs. 6. That the pistol or gun with which deceased was killed was accidentally discharged, the bullet entering his left chest, causing almost instant death, that the pistol with which deceased was shot was found lying on his bed, four bullets having been removed therefrom which were also lying on the bed, and deceased had removed his shirt preparatory to retiring. 7. That the death of insured resulted from bodily injuries effected directly and independently of all other causes through external, violent, and accidental means, there being a visible contusion or wound on the exterior of insured's body on the left side near his heart, which, independently and exclusively of all other causes, resulted in death of insured almost immediately and within ninety days of the accident; nor was his death the result of a criminal act of a third person nor intentional act of his own." To these allegations the defendant filed special demurrers substantially as follows: (1) The allegation that deceased was accidentally killed by a gunshot wound, etc., is a conclusion of the pleader, "and does not show how nor in what manner said insured was accidentally killed, and does not allege sufficient facts upon which to base the conclusion that the gunshot wound was accidentally inflicted." (2) It does not appear in the petition "whether insured shot himself or whether he was shot by another." (3) The "facts and circumstances surrounding said shooting are not set out in the petition." (4) The allegation, "nor was his death the result of a criminal act of a third person nor intentional act of his own," is a conclusion, unwarranted by the facts pleaded.

These demurrers are without merit. The allegation that the insured was found alone in his room on the bed, with a pistol wound in his chest, which caused instant death, authorized the allegation that the death was accidental. From these facts the law presumes the death to have been accidental, and therefore it is legitimate so to allege. To hold that the allegations of the petition can not be aided by the presumption would be tantamount to a ruling that the pleader must allege facts which in fact prove the presumption. That presumptions do apply to pleadings, see *Edenfield* v. *Bank of Millen, 7 Ga. App.* 645 (67 S. E. 896); *Wilson* v. *Sprague Mowing Machine Co., 55 Ga.* 672; *Cribb* v.

*Waycross Lumber Co.,* 82 *Ga.* 597 (9 S. E. 426). Nor do we think the petition subject to the demurrer that it does not allege or show "whether insured shot himself or was shot by another." The petition set out a cause of action, without a showing in this regard. The petition does not allege by whom the pistol was discharged, and the law does not presume that it was discharged by another. "Reasonable definiteness and certainty in pleading is all that is required; and factitious demands by special demurrer should not be encouraged. Indeed, it is the opinion of the members of this court that this 'critic,' not of the old school but of recent times—special demurrer, has lately been given much greater recognition in our courts than his importance or his usefulness has ever deserved." *Busby* v. *Marshall,* 3 *Ga. App.* 764 (60 S. E. 376). The other two demurrers are equally without substantial merit. A petitioner can not be required to amend to add superfluous matter to his cause of action as stated.

By virtue of the defendant's answer it became an issue before the jury whether the insured had made to the defendant company a false representation, material to the risk, stating that he had not, in the five years immediately preceding the date of the application, made use of intoxicating liquor. Under the view we take of it, we need not go into the materiality of such a representation when made in an application for life insurance, and we omit the many citations of authorities on the subject contained in the brief of counsel for plaintiff in error. Stated briefly, our view is that the jury were at liberty to believe that the representation was true. Therefore we do not agree with the sweeping statement contained in the brief, that the undisputed evidence disclosed that the representation was untrue. The defendant company produced two witnesses on this issue, Mrs. Joseph N. Elliot and W. C. Caraway. Mrs. Elliot testified that she had known the insured since 1931. "The reason I remember him so well, I was coming out of the door at 387 Boulevard, and had a small child in my hand, who was only seven months old, and he was coming in the building and almost knocked me down. He did not make any apology whatever. He ran into me and kept on staggering on, and didn't apologize. . . I did not see him drinking whisky but he always acted as if he had been drinking. . . I would say in my opinion that up to November, 1935, William Daniel Bentley

drank intoxicating liqours. . . Prior to November, 1935, I have seen him on three occasions I know of, intoxicated, and then on three or four or six others that I am not sure about." W. C. Caraway testified that he was employed at Sterchi Brothers Furniture Company; that the insured had worked with him a short while before his death; that he knew the insured about four months, and went about with him socially at night; that "prior to November 12, 1935, William Daniel Bentley used intoxicating liquors. . . He at least drank it on an average of once a week, and sometimes more. I couldn't say for sure how often he drank. . . I have been at home and seen him drink liquor . . in the presence of his mother. I have seen him drunk on possibly fifteen or more occasions. . . I couldn't say on how many occasions I have seen him drunk at dances, at least four or five." The evidence standing alone, would, in all probability, have led the jury to take a different view from that inferred from their announced verdict.

However, we must view the evidence in the light of that produced by plaintiff on this issue. To begin with, the plaintiff introduced Mrs. T. Rothman, and Mrs. M. L. Sawyers, who both testified that they knew Mrs. Elliot, knew her general reputation, and that they would not believe her under oath. It is provided in our Code, § 38-1804, that "A witness may be impeached by evidence as to his general bad character." Whether or not a witness has been successfully impeached is a question for the jury (*Huff* v. *State,* 104 *Ga.* 521 (2), 30 S. E. 808; *Williams* v. *State,* 69 *Ga.* 11 (28), 14; *Rice* v. *Eatonton,* 15 *Ga. App.* 505 (4), 83 S. E. 868) ; and where an attempt has been made to impeach a witness and the jury becomes mentally convinced that he is unworthy of credit, they are at liberty to reject the testimony of such witness. *Rudulph* v. *State,* 16 *Ga. App.* 353 (3) (85 S. E. 365); Code § 38-1806. In detailing his knowledge of the insured's habits of using intoxicants, W. C. Caraway testified that he had been in the home of the insured and seen him drink in the presence of his mother, the plaintiff in this action. The plaintiff denied this, and testified that she had never seen her son take a drink, had never smelled it on his breath, and had never seen him under the influence of intoxicating liquor. In this connection our Code further provides: "A witness may be impeached by disproving the facts

·testified to by him." § 38-1802. The jury were authorized to accept the testimony of the plaintiff as the truth, and to reject as an untruth Caraway's statement that he had seen her son take a drink in her presence. Believing him to have told an untruth as to this material fact, they might reject his other testimony as likewise untrue, although they need not necessarily do so. *Elliot* v. *State*, 138 *Ga.* 23, 26 (74 S. E. 691). Furthermore, the plaintiff produced additional testimony on this issue, which, though negative, tended to contradict the testimony produced by the de-·fendant. Mrs. Bentley testified that her son lived in the house with her the five years previously to his death. "He did not drink any whisky or intoxicants or use any narcotics at any time prior to his death. I have never smelled any whisky on him in my life. He was one of the best boys I ever knew to stay home with his mother, and he never had any whisky around home. . . He slept at home every night. I saw him practically every night when he came in."

W. C. Phlieger, brother-in-law of the insured, testified that he had known the insured about eight years, and during that time had seen him both day and night, had never seen him under the influence of intoxicants, and had never smelled whisky on his breath. To this same effect was the testimony of his sister, Mrs. Phlieger. Mrs. J. E. Starr testified that the insured was a friend of her son, and that she had seen him in her home many times, and had never smelled intoxicants on his breath. Frank Starr testified that he was a friend of the insured, knew him about five years, and saw him nearly every day and lots of times at night, and had never seen him drink or under the influence of intoxicants. Woodrow Dale testified that he knew the insured approximately four years, and lived at the same address in 1933 and 1934. He had seen him often during that time, but never saw him take a drink or smelled it on his breath. Arthur Joseph Bremer knew the insured above five years, and "ran around" with him, but never smelled liquor on him, and never saw him take a drink. J. J. Hill knew the insured about six months, let him have a space in his place of business to run a radio shop, never smelled whisky on him or saw him take a drink. Mrs. T. Rothman knew the insured nine or ten years. He frequently came to her home. She never saw him under the influence of intoxicants or smelled liquor

on him. Mrs. M. L. Sawyers knew the insured for about six years. He came to her home often; she never smelled liquor on him, and never saw him under the influence of liquor. T. J. Weaver lived near the Bentleys, saw the insured often, and never saw him look as if he were intoxicated. Mrs. Grace Haynie knew the insured about five years, saw him frequently, two or three times a day, never smelled whisky on him, and never saw him take a drink. Mrs. Oscar Stowe, a first cousin, lived in the same neighborhood with the Bentleys; saw the insured during the day and nearly every night six months before his death, and never had seen him under the influence of intoxicants. She saw him nearly every night while he was working with Mr. Caraway at Sterchi Brothers Furniture Company. Other witnesses gave testimony substantially as set out above, which we will not set out here. While it is true that "The existence of a fact testified to by one positive witness is to be believed, rather than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they did not see or know of its having existed" (Code, § 38-111), yet circumstances may outweigh positive testimony (*Bowie* v. *Maddox,* 29 *Ga.* 285 (2), 74 Am. D. 61), and jurors are not obliged to discard negative evidence merely because of the existence of positive evidence in conflict therewith. *Ga. R. & Bkg. Co.* v. *Wallis,* 29 *Ga. App.* 706, 714 (116 S. E. 883).

Viewing the evidence most favorably to the plaintiff, it appears that the insured, an eighteen-year-old boy, was living with his mother in a two-story duplex apartment, with the bedrooms upstairs. On the night of his death he came home about 8:30. When he came in, there were present his mother, the plaintiff, his sister and her husband, Mr. and Mrs. Phlieger, a friend of his mother, Mr. Edwards, and Mrs. Clara Gillette, a friend of the family. The insured asked for something to eat, and was told that there were some sandwiches in the kitchen. He went back to the kitchen, and in a few minutes came back to the front, laughing and talking to the family. He turned on the radio, and danced with Mrs. Gillette. She was quite drunk. He remarked that he was tired and was going to bed. His mother asked him to get in some coal and wood before retiring, which he did. He seemed to be in very good spirits. In the meantime Mr. and Mrs. Phlieger had retired to their bedroom. A short while after

the insured went to his room, Mrs. Gillette went upstairs to the bathroom. When she left, Mrs. Bentley asked her to go to the insured's room and get his watch for her. In a few minutes Mrs. Bentley heard a noise "as if the toilet-seat had fallen," then heard a groan. She rushed upstairs, and met Mrs. Gillette about three steps from the top, coming down. They found the insured lying on the bed "kind of crossways," "like he had been sitting on the bed." The light was on in the room, and the door partly open. A pistol lay on the bed by the insured, with only one bullet in the cylinder, which had been discharged. The pistol held five bullets and the other four were found near him on the bed. He had been sleeping with this pistol under his pillow for about two weeks, because of the family's fear of burglars. Mr. Edwards testified: "It looked like he had been fooling with the gun and it went off." He had on previous occasion seen the insured clean this gun and had warned him to put it up. The insured replied that there was nothing in it, and witness told him that that was the kind of gun that killed people. Mr. Phlieger testified that the insured had that day remarked to him about his room, said he could have it by himself and work on his radios, and nobody to bother him; he thought he would get a lot of work to do. The pistol was found close to his feet and towards his head. The bullet entered between the fifth and sixth ribs, between the nipple line and the sternum line. There were powder burns on the body. The pistol was evidently close to his body when it was discharged. A companion of the insured testified that on one occasion, shortly before the death, he went home with the insured and went to his room, and that as soon as they got there, he "got his gun and started to play with it and pointing at myself, and I said 'Dan, you ought not to do that; that is dangerous,' and he said 'Well, it is not loaded,' and I said 'Yes, that is what lots of people think; that is the way a lot of people get killed,' and he just laughed about it." The insured was a radio technician. He had worked in this capacity at Sterchi Brothers Furniture Company for several months, and had lost his job about a week before. He had been given space in a friend's place of business to operate his own repair-shop, and seemed to be very much satisfied, and expectant of his future progress and earnings. He had some work on hand at the time of his death.

The defendant introduced several witnesses who testified that they heard his mother and sister say the night of his death that they did not know why he killed himself except that he had received a letter from his best girl saying that he should never come to see her again and that he was despondent over having lost his job. Counsel for plaintiff in error lays much stress on this evidence, in his brief and in his argument of the general grounds of the motion. However, we are not to consider this evidence in determining whether the evidence supports the verdict; for Mrs. Bentley and the insured's sister both denied making any such statement, and testified that they did not know of any such letter having been received by the insured. Mrs. Bentley also denied ever having "prodded" the insured about not making more money. She testified that she had only advised with her son as any mother would, in helping him get ahead. In an action on a life policy which provides that "in case of self-destruction committed, whether sane or insane, within two full years from the date hereof, the extent of recovery hereunder shall be the premiums paid," the burden of proving self-destruction, under this provision, rests on the insurer. Where such policy contains a "double-indemnity" clause providing for the payment of an additional amount equal to the face value of the policy, the burden of proving that death resulted "from bodily injuries effected directly and independently of all other cause through external, violent, and accidental means," as provided in the policy, rests on the plaintiff. On the one hand, the law does not presume that a man intentionally took his life; on the other, where the manner of his death is unknown, that is, where it is doubtful whether death was caused by an accident or by suicide, the presumption arises that an accident, and not suicide, was the cause of his death. Therefore, in an action on such a policy, where it is shown that the insured died as a result of a pistol wound, and the manner in which the pistol was discharged is unknown, in order to defeat a recovery under either of the terms of the policy, it is necessary for the insurer to rebut the presumption against suicide. *Mutual Life Insurance Co.* v. *Burson,* 50 *Ga. App.* 859 (179 S. E. 390); Travelers Ins. Co. *v.* Melick, 65 Fed. 178 (27 U. S. App. 547, 27 L. R. A. 629); Standard Life &c. Ins. Co. *v.* Thornton, 100 Fed. 582, (49 L. R. A. 116); Wilkinson *v.* Ætna Life Ins. Co., 240 Ill. 205 (88 N. E.

550, 130 Am. St. R. 269, 25 L. R. A. (N. S.) 1256); Johns *v.* Northwestern Mutual Relief Asso., 90 Wis. 332 (63 N. W. 276, 41 L. R. A. 587); *Travelers Ins. Co.* v. *Sheppard,* 85 *Ga.* 751 (10) (12 S. E. 18).

Presumptions of law, as is the presumption against suicide and in favor of accident, are conclusions and inferences which the law draws from given facts. "Doubtless all presumptions of law not originating in statutes were once presumptions of fact, and gradually developed into presumptions of law by a process of evolution; and most probably many inferences and conclusions destined to become presumptions of law in the future, are now in the formative stage, passing and repassing through the jury-box. Before any presumption not manufactured by the legislature can mount to the bench, it has to serve for a long season on the jury, and be trained for judicial administration." *Kinnebrew* v. *State,* 80 *Ga.* 232, (5 S. E. 56); *Dyer* v. *State, 6 Ga. App.* 390 (65 S. E. 42). A presumption of law, such as the presumption against suicide, duration of life for seven years, of innocence, of a mental state once proved to exist, and similar presumptions *may be rebutted by proof.* Code, § 38-118. Such a presumption is merely a circumstantial inference selected by the law as the most rational hypothesis from given facts, and may or may not be rebutted according to the quality of evidence introduced. It yields to direct, positive, and uncontradicted evidence, i. e. it gives way to proved facts. *Hamby* v. *Crisp,* 48 *Ga. App.* 418 (6 *a*) (172 S. E. 842); *National Life &c. Co.* v. *Hankerson,* 49 *Ga. App.* 350 (7) (175 S. E. 590). It will yield to a contrary conclusion, where the circumstances supporting such contrary conclusion exclude the presumption as a reasonable hypothesis by a preponderance of the evidence. *Georgia Railway & Electric Co.* v. *Harris,* 1 *Ga. App.* 714 (57 S. E. 1076). Thus it was said in *Hodnell* v. *Ætna Life Ins. Co.,* 17 *Ga. App.* 538 (87 S. E. 813), "There being no conflict in the evidence as to the physical facts connected with the death of the insured, and *these facts, with all reasonable deductions and inferences therefrom, overcoming the presumption* of law that he did not kill himself, or that his death was accidental, and *demanding* a finding that he came to his death by his own hand and intentionally, and the life-insurance contracts sued upon containing the special provision that they should

be void in the event of the death of the insured by his own intentional act, sane or insane, within one year from the date of their issue, and it affirmatively appearing that these contracts were issued within one year of his death, the trial judge did not err in directing a verdict for the defendant company." See also *Pilot Life Ins. Co.* v. *Wise,* 48 *Ga. App.* 540 (173 S. E. 252); *New York Life Ins. Co.* v. *King,* 28 *Ga. App.* 607 (112 S. E. 383); *Sovereign Camp Woodmen of the World* v. *Simmons,* 33 *Ga. App.* 566 (126 S. E. 891). A presumption of law, being a circumstantial inference, may become more probable, as existing in fact, by the introduction of supporting evidence, or may become less probable by the introduction of circumstances tending in some degree to overthrow it, but will not necessarily disappear unless rebutted to the extent we have already pointed out. *Strauss* v. *Pearlman,* 15 *Ga. App.* 86 (82 S. E. 578). If the facts and circumstances fail to rebut the presumption in the degree already pointed out, the presumption does not disappear, but remains a circumstantial inference drawn by law, in contradistinction to a presumption which is a mere rule of procedure affecting the duty of going forward with evidence.

In the present case the insured was found alone in his room, lying on his bed, clothed in his pajama pants and an undershirt, with a pistol wound through his chest and a pistol near by on the bed, with a discharged cartridge therein. The presumption of law is that the death was accidental. It was the duty of the insurer, in order to defeat a recovery, to rebut this presumption with counter-evidence, not merely its duty to go forward with the evidence. In the present case we have no witness who attempted to testify positively that the insured did commit suicide. There exists no direct, positive testimony that contradicts the presumption, and the evidence introduced does not point clearly and unequivocally to death by suicide. We do not attempt to try to analyze exactly how the insured came to his death; that is, whether he pulled the trigger thinking the gun was not loaded, or whether he was trying to fix the gun in any way and accidentally pulled the trigger. It is enough to say that the evidence does not disclose facts clearly inconsistent with these theories. There was not the slightest evidence of preparation by the insured for such an event. Here we have a young man of good health, blessed

with a happy and cheerful disposition, full of hope for the future in his selected line of endeavor, who comes home, feels and satisfies a pang of hunger, who dances, brings in coal and wood, makes no move or says anything which would indicate an intention to take his own life, who goes to his room to go to bed, for he was tired, undresses and prepares for bed, and a few minutes later is found with a bullet wound in his heart, with the pistol with one cartridge in the cylinder which had been discharged. Does this indicate, to the exclusion of the hypothesis of accident which the law has adopted, that the insured committed suicide? Do the insured's actions sound like the actions of a man about to commit suicide? Are we to suppose that the thought of suicide came to him while he was undressing for bed, when only a few minutes before he had been so cheerful? Human beings do not approach death with such serenity and calm. The insured slept with this pistol under his pillow. He was a fixer, a tinkerer, as so many young boys are. On another occasion he had been seen playing with this very gun, pointing it at himself, cleaning it, toying with it. Was he doing this when the pistol was discharged? We can not say, but we can say that the evidence does not point conclusively or clearly to the fact that the insured discharged the pistol with the intent to kill himself. *Gem City Life Ins. Co.* v. *Stripling,* 176 *Ga.* 288 (168 S. E. 20) ; *Peppers* v. *Sovereign Camp W. O. W.,* 53 *Ga. App.* 851 (187 S. E. 215). The court did not err in overruling the general grounds of the motion for new trial.

From what we have said with reference to the presumption against suicide and in favor of accident, under the facts of this case, it is evident that we do not think the judge erred in charging the jury on this presumption. See *Mutual Life Ins. Co.* v. *Burson,* supra. "It is not error that the court should tell the jury what the legal effect of evidence is. On the contrary, it is his duty to do so. He must not say or intimate what is or is not proved, but if facts be proved, then he may and should say what effect the law gives to the proof of such facts." *Hagar* v. *State,* 71 *Ga.* 164. See also *Hamby* v. *Collier,* 136 *Ga.* 309 (71 S. E. 431), where the court held that it was error for the court to refuse a requested charge to the effect that the law *presumes* that all public officers and authorities do their duty as prescribed by law. "In charging on the subject of the impeachment of wit-

nesses, it is not incumbent upon the court to name the witness or witnesses whose credibility is attacked; it is only necessary (and it is the better practice) to instruct the jury as to the legal rules on the subject of impeachment, leaving to them the duty of making the application of the rules to the evidence and to the witnesses." *Woodard* v. *State,* 5 *Ga. App.* 447 (63 S. E. 573). When a witness testified that she knew the general character of another witness in the community in which she lived, and that from that character she would not believe her under oath, a charge by the judge on the subject of impeachment of a witness by showing general bad character was authorized. The fact that another witness had been sworn for the defendant, and counsel for plaintiff had brought out on cross-examination the fact that he drank to excess, would not make the charge error as leading the jury to believe that he had been attacked for general bad character. Under the *Woodard* decision, supra, it was not necessary for the court to specify the witness so attacked. See also *Rhodes* v. *State,* 144 *Ga.* 837 (4) (88 S. E. 196). The court did not err in overruling the motion for new trial.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*