28063, 28117. SCHNEIDER *v.* METROPOLITAN LIFE INSURANCE COMPANY; and *vice versa.*

Decided March 7, 1940.    Rehearing denied March 30, 1940.

*C. H. Dalton, D. W. Mitchell, W. M. Henderson,* for plaintiff.
*Barry Wright, Jack Rogers, Hardin & McCamy,* for defendant.
Stephens, P. J.   Mrs. Pauline Schneider brought suit against Metropolitan Life Insurance Company, to recover on a policy of insurance issued by the defendant on the life of her husband.   The policy provided that should the insured die as the direct result of bodily injury effected solely through external, violent, and acci-

dental causes, the insurer would pay to the beneficiary double the face amount or value of the policy. The plaintiff alleged, that the defendant had paid to her the principal amount of the policy, but refused to pay the additional sum equal to the face value of the policy under the double-indemnity clause; that her husband met his death as the result of violent, external, and accidental means; that due proofs of death had been submitted to the defendant, that after demand the defendant had refused to pay the amount claimed under the double-indemnity clause of the policy, and that such refusal was in bad faith, and therefore the plaintiff became entitled to recover an additional sum of 25 per cent. of the principal sum sued for, and attorney's fees. By an amendment the plaintiff alleged that, in addition to the formal proofs of death furnished by her to the defendant, she had, during the period allowed for submitting notice of death, through her attorneys notified the defendant of her husband's accidental death, and in response an agent of the defendant called upon her attorneys and denied liability under the double-indemnity clause of the policy. The defendant demurred to the petition as amended. To the overruling of its demurrer it excepted pendente lite, assigning error in the cross-bill of exceptions.

At the trial the plaintiff introduced evidence tending to show that her husband was aiding a neighbor in catching a hog at a barn; that shortly thereafter a noise was heard, and the insured was found lying in the doorway of the barn; that there was a "kindly blue spot" on the forehead of the insured; that he never regained consciousness; that an automatic pistol was found a foot or two from where he was lying; that there were no powder burns on his flesh; that one witness was under the impression that he saw some powder burns on the brim of the hat of the deceased; that the doctor who examined the deceased testified that the range of the bullet was downward and the pistol would have had to be a little more than horizontal with the handle to have made the wound, and in his opinion the pistol was fired at close range; that the pistol had been sold to the insured about six months before his death; that it was a 25-calibre Orkey automatic of German make; that it was a small pistol, and had a trigger in front of the handle, and when the trigger was mashed the pistol would shoot several times, and unless the trigger was released it would continue to

shoot; that the magazine of the pistol could be taken out and one cartridge left in the barrel, but when the pistol was found near the body of the deceased the magazine had been taken out and was found on his person. There was evidence that the insured had always been a man of jovial and kindly disposition; that he had a wife and two children; that there was no marital or family trouble to worry him, that on the day of his death and shortly before he appeared to be in the same unworried, genial, and contented mood; that there was nothing about his actions to indicate anything unusual or that he would take his own life. One witness testified that he was talking with the deceased, shortly before his death, about the death of Mr. Runyan, and the deceased remarked: "There is one thing about it. I will be here until Gabriel blows his trumpet before I will do anything like that. I will never have any intention of doing anything like that." There was evidence that he had frequent attacks of kidney colic, which lasted some minutes during which the deceased would have fits and would suffer excruciating and intense pain and agony. There was evidence that the deceased, until the day before his death, had operated a store for another person on a fifty-fifty basis, that is, that he would receive fifty per cent. of the profits and be liable for fifty per cent. of the losses, and evidence indicating that he claimed that some previous time he had been robbed at this store and tied up, and that the persons he accused of the robbery were not convicted thereof; and evidence that two or three days before his death the deceased stated that he had the promise of two jobs and was going to take one of them, but did not know which one.

There was evidence from which a jury might find that the insured was $150 short in the settlement of his division of the profits in the store business, and that his wife made up this shortage after his death. The assistant superintendent of the defendant for the Rome district testified, on cross-examination, that he did not know about the insured's shortage until after his death. On redirect examination by counsel for the plaintiff this witness stated that the defendant's counsel asked him if the insured "was short over there at the store, and I answered 'yes,' following my investigation. As to who furnished me with the information, I was out there when the representative of one of the Chattanooga concerns was there, and overheard the conversation. I don't know anything

about it of my own knowledge." Counsel for the plaintiff objected to the question and answer as hearsay, and the court stated: "He said he didn't know it of his own knowledge." Other witnesses testified that they knew nothing of any shortage between the insured and the owner of the store, Mrs. Evans. Mrs. Evans was not put upon the witness-stand. Her husband testified that his son looked after Mrs. Evans' interest in this store, and that he would have an accounting with the insured periodically. Another witness testified that he saw the insured almost daily, and that he never did seem to be despondent or anything like that; and that he did not know of any reason that would cause the insured to take his own life. In the proof of death submitted to the insurer immediately after the death of the insured, and as a result of which the insurer paid to the plaintiff the principal amount of the policy, the cause of the death of the insured was stated to have been "gunshot wound self-inflicted." This was signed by the plaintiff. The assistant superintendent of the defendant for the Rome district testified that this proof of death was filled out by him at the plaintiff's home, and that the answers were written by him and read over to the plaintiff and she signed them. The plaintiff testified that the defendant's agent filled out whatever papers she signed; that she was sick when he brought the paper out for her to sign and that she meant by the answer to the question as to the cause of death being "gunshot wound self-inflicted" that the cause of death was "an accidental gunshot wound," and "that is what I meant when I told Mr. Howard at the time." The judge, on motion, granted a nonsuit, and the plaintiff excepted.

It is contended by the defendant, that the evidence showed that the insured "had cause for committing suicide, and the fact that the deceased did have to grip the pistol and squeeze it in order to pull the trigger shows that the same was not an accidental discharge of the pistol, and therefore could not be an accidental death;" and that the burden of proving the death of the deceased was not carried by the plaintiff "to such an extent as to show accidental death." In a suit to recover under the double-indemnity clause of a life-insurance policy payable where the death of the insured is the result of bodily injury effected solely through external, violent and accidental causes, the burden of proof is on the plaintiff to show that the death resulted in the manner described.

If the insured intentionally caused his own death by his own act, such death would not be effected by an accidental cause, and there could be no recovery. Where it is shown that the insured died as a result of a gunshot wound, without any further explanation as to the cause of the death, there arises an inference or presumption of a death by accident rather than by suicide. The plaintiff must make out her case, and in so doing, she may use the presumption against suicide which the law recognizes as arising out of the natural instincts of man, one of which is his love of life. In a case where the fact of death is established and the evidence points equally or indifferently to accident or to suicide as the cause thereof, the theory of accident rather than suicide is to be adopted. This rule means that upon proof of a violent death, such as a death from a gunshot wound, where there is no evidence from which it can be inferred whether the death was accidental or suicidal, and therefore the evidence points equally either way, the presumption against a death by suicide obtains and comes to the aid of the plaintiff, and the jury is authorized to find that the death was due to accident; but in a case where there is conflicting evidence as to whether the cause of death was accidental or suicidal, and the jury would be authorized to infer from the evidence either way, this presumption disappears, although the fact upon which the presumption rests, which is a person's love of life rather than death, may still be considered by the jury in arriving at a conclusion.

There was evidence to the effect that the insured was of a happy and jovial nature, and did not appear just before his death to have been despondent or worried, that he had a wife and two children with whom he was apparently on the best of terms, that he had at one time stated, in discussing the death of another, that he would never intentionally take his own life, and that he informed a witness that he had two jobs in prospect and would take one of them. It also appeared from the evidence that while the pistol was fired close to the deceased, it was not close enough to produce powder burns on his flesh. It is true that there was evidence that the deceased had been in ill health for some time, and there was some evidence that he had drawn more than his share of the profits in the store business; but there was no evidence that he was facing any trouble about this or that he was worrying about it. It therefore follows, that, regardless of the presumption against suicide,

and conceding that the evidence would have authorized an inference that the death of the insured was the result of suicide, the evidence was sufficient, considering the natural instinct of a man to love life, to authorize the inference that the death was not the result of intentional self-destruction; and the question whether the death of the insured was effected solely through external, violent, and accidental causes, or was the result of suicide, was properly one of fact for the jury, and not a question for the court. 6 Couch on Insurance, § 1262(r); *Peppers* v. *Sovereign Camp W. O. W.,* 53 *Ga. App.* 851, 854 (187 S. E. 215); *Jefferson Standard Life Ins. Co.* v. *Bentley,* 55 *Ga. App.* 272 (3), 279 (190 S. E. 50); *Metropolitan Life Ins. Co.* v. *Kennedy,* 55 *Ga. App.* 554 (12), 560 (190 S. E. 873). The fact that the plaintiff had stated, in the proof of death furnished to the defendant shortly after the insured's death, and which was filled out by the agent of the defendant and signed by the plaintiff while she was at home sick, in answer to the question as to the cause of death, that it was caused by "gunshot wound self-inflicted," was not an inexplainable and binding admission on the part of the plaintiff that the insured had intentionally taken his own life. Suicide is the intentional taking by one of his own life. A death might be the result of a gunshot wound self-inflicted, and not be suicide. *Mutual Life Insurance Co.* v. *Durden,* 9 *Ga. App.* 797 (72 S. E. 295); *Freeman* v. *Metropolitan Life Insurance Co.,* 35 *Ga. App.* 770 (134 S. E. 639). The plaintiff testified that she meant by this answer that the cause of the death of the insured was "accidental gunshot wound."

The contention of the defendant that the nonsuit should be sustained "because the plaintiff did not show that, in accordance with the terms of the policy, she had submitted due proof that the insured, 'after attaining age fifteen (15) and prior to attaining age seventy (70) has sustained, after the date of this policy, bodily injury solely through external, violent, and accidental means, resulting directly and independently of all other causes in the death of the insured within ninety (90) days from the date of such bodily injury while this policy was in force,'" is not well founded. The plaintiff alleged and proved that proof of death was submitted to the defendant in compliance with the policy, and that any and all liability under the double-indemnity clause was denied by the insurer; and that on demand of her attorneys the defendant's agent

and assistant superintendent of the Rome district called upon them and denied any and all liability. This agent was placed on the witness-stand and cross-examined by the defendant's counsel, and no denial of this fact was made by him. The plaintiff testified that the defendant "denied liability on the double indemnity." The defendant's agent testified, on cross-examination, that "as to whether or not, at the time she claimed any accidental benefits under that policy, I told her there wouldn't be any." Such demand for payment and refusal to pay was within sixty days from the death of the insured. A denial of liability on the part of an insurer and an absolute refusal, on demand, to pay, made within the time required by the policy for the furnishing of proof of death (and not predicated upon a failure to furnish proof of death or some ground other than a denial of all liability), amounts to a waiver of such proof. Code, § 56-831; *National Life Insurance Co.* v. *Jackson,* 18 *Ga. App.* 494 (89 S. E. 633); *Travelers Insurance Co.* v. *Sanders,* 47 *Ga. App.* 327 (170 S. E. 387); *Patrick* v. *Travelers Insurance Co.,* 51 *Ga. App.* 253 (180 S. E. 141). Besides, it would seem that the statement of the plaintiff in the proof of death furnished to the defendant that the deceased came to his death by a "gunshot wound self-inflicted" was a sufficient proof of death as a result of bodily injuries effected through external, violent and accidental means. The case at bar is not like *Cordell* v. *Metropolitan Life Insurance Co.,* 54 *Ga. App.* 178 (2) (187 S. E. 292), and the rule laid down in that case that a notice and claim for temporary disability is not notice of permanent disability under a policy providing a different indemnity for each. The proof of death submitted by the plaintiff was under the double-indemnity provision of the policy, and did not amount merely to a proof of death under the single-indemnity provision. The evidence was sufficient to authorize a jury to find for the plaintiff, and the court erred in awarding a nonsuit.

In paragraph 10 of the petition the plaintiff alleged that she submitted proof of death of the deceased in compliance with the contract, that the defendant denied liability under the double-indemnity clause, though paying her the single indemnity "within 60 days after a demand had been made by petitioner under said policy for this reason," that the plaintiff therefore charges that the defendant, under the Code, § 56-706, is due to pay to her, "in

addition to the principal sum of $240, an additional sum of $60, or 25% of said principal, for its failure to pay said loss within 60 days after demand was made for payment," and that the defendant is also liable in the sum of $250 as reasonable attorney's fees for prosecuting this case. The defendant demurred specially to this paragraph, on the ground, among others, that it was not alleged therein "when, where, nor how demand for payment of said sum was made of this defendant."

The plaintiff amended her petition on July 31, 1939, and alleged that on February 8, 1938, she again notified the defendant of the accidental death of her husband, by and through a letter from her attorneys to the defendant, in which letter the attorneys informed the defendant that they had been employed to represent the plaintiff "in suit or settlement growing out of the accidental death of her deceased husband," and requested that the defendant forward to them the policy which the plaintiff had delivered to their local agent when he delivered to her the check for the single indemnity, and requested the company to advise them what it expected to do about the claim for double indemnity. The plaintiff further alleged that the defendant on February 18, 1938, acknowledged receipt of this letter from her attorneys, and stated that it would have its representative call upon them in connection with the claim; that on February 22, 1938, the defendant's agent called upon her attorneys and "denied any and all liability under said policy, and refused to pay the same;" and that due proof was submitted to the defendant in writing on January 7, showing the accidental death of the insured by a pistol wound inflicted in his head, such death being caused solely by external and violent means. The defendant objected to the allowance of the amendment, on the ground that it was an attempt to plead evidence and to plead self-serving declarations, and was immaterial and added nothing to the petition. The court overruled these objections and allowed the amendment. Thereupon the defendant insisted on its original demurrers to the petition as amended, and the court overruled the demurrers. The defendant excepted pendente lite to the allowance of the amendment and to the overruling of its renewed demurrers to the petition as amended. The amendment to the petition alleged that on February 8, 1938, the plaintiff again notified the defendant of the accidental death of the deceased through her attorneys in a letter

asking the company what it expected "to do about this claim" for double indemnity. Whether or not this alleged a demand such as is required under the Code, § 56-706, as the basis for recovery of attorney's fees and penalty against the company for a refusal to pay the claim within sixty days after demand, where it appears that such refusal was in bad faith, it does appear from the amendment "when, where, and how" such notice was given to the defendant. The original demurrer to the petition as amended, in so far as it referred to paragraph 10, was a special demurrer on the ground that it was not alleged "when, where, nor how damand for payment of said sum was made of this defendant." The amendment met this special demurrer in so far as it referred to the notice which the plaintiff alleged was given to the defendant. The petition as amended set out a cause of action, and was not subject to any of the grounds of demurrer. The judge did not err in overruling the demurrer. *Jefferson Standard Life Ins. Co.* v. *Bentley,* 55 *Ga. App.* 272, 275 (190 S. E. 50).

*Judgment reversed on the main bill of exceptions and affirmed on the cross-bill. Sutton and Felton, JJ., concur.*