29560. GREEN *v.* METROPOLITAN LIFE INSURANCE CO.

DECIDED JULY 6, 1942.

*Stevens & Stevens,* for plaintiff.

*Randall Evans Jr., Jack D. Evans, Cohen & Cohen,* for defendant.

SUTTON, J. Mrs. Willie Green brought suit against Metropolitan Life Insurance Company, as beneficiary, to recover $500 as

double indemnity under an insurance policy issued to her husband, Willie Green, and also to recover damages and attorney's fees on account of the alleged bad faith of the company in failing to pay under the double-indemnity provision of the policy, the company having paid, without prejudice to her rights, the face amount of the policy on the life of the insured. The policy provided, among other things, that "Upon receipt of due proof that the death of the insured resulted, independently of other causes, from bodily injuries caused solely by external, violent, and accidental means, the company will pay, as an additional death benefit, an amount equal to the amount payable under the schedule, unless such injuries were sustained [under circumstances not here involved]," and that "the additional benefit shall not be payable if the insured's death . . is the result of participation in an assault or felony."

The insurance company filed an answer denying liability, admitting that the insured came to his death on November 24, 1939, from shotgun wounds inflicted upon him, but defended on the ground that his death did not result "independently of other causes from bodily injuries caused solely by external, violent, and accidental means;" setting up that at the time he met his death, at the hands of one Albert Hinton, he had been warned by Hinton that he would be killed if he came to Hinton's house, and that at the time he was shot he was attempting, after dark, to get into the window of Hinton's home and was armed with a pistol, and that the shooting and the injuries resulting in his death were not unusual, unexpected, and unforeseen by the insured, but were just what he had been told to expect, and that from the nature of his act he must have foreseen that he would be shot and killed if detected; that the shooting of the insured was the natural and known consequence of his own act, was a risk which he assumed, and that an injury and consequent death did not result by accidental means. The defendant denied that due proof of the death of the insured had been made on December 17, 1939, as alleged in the petition. It admitted issuing a receipt for proof of death and that it received a proof of the death of the insured, but received no proof showing death by accidental means.

The jury returned a verdict in favor of the defendant. The plaintiff filed a motion for new trial, and by amendment added several special grounds. The court overruled the motion and the exception here is to that judgment.

Upon the trial of the case the following evidence was introduced: Mrs. Willie Green testified that she was the widow of the insured; that she saw his body after he had been brought home, his face showing evidence of having been shot; that she made demand upon the company for the double indemnity under the policy but had not been paid.

Albert Hinton testified: "When I first knew him [the insured] was in 1926. . . Worked for him a while in 1930. . . In 1933 I never had any dealings with Willie Green. I did see him in my home. That was in 1933, I don't recall the date. I had been to work that morning and went home. When I got home I set right down at the edge of the yard in some high weeds and just watching. I saw Willie Green. I said something to him. He was in my house. My wife was there. Willie ran out of the house. I stepped up on the steps and asked Willie 'What are you doing here?' and he said 'I've been out here looking at this timber.' He said he stopped here to get a drink of water. I said 'Willie, there is no well here.' He said 'Well, I just stopped here to get a drink,' and I said 'Here is the water bucket out here on the porch,' and at that time I turned around and he started out and I got my gun and stopped him. I sent for sheriff Norris. I had a shotgun. In the presence of the sheriff I told him I would kill him if he footed my premises again. . . Sheriff Norris said 'Albert, just let him alone, and I will talk to him and he won't never bother you any more.' He told him, he said, 'Willie, stay away.' Willie said he never intended to foot my place again. That was in 1933. The next time I saw him in my home it was in '36. . . Well, in the meantime on Friday I was at home. I was working at night at that time, and I was sitting there and my wife was getting ready to get off. They were having some big act. When I was sitting there by the window somebody blowed the horn. I looked out the window. I seen who it was. It was Willie Green, just about a hundred yards above where you turn in. Well, I was sitting by the window with the shade pulled partly down, and some of the children run to the door and he kept on by and didn't stop. He goes on up the road beyond there five or ten minutes and came back but he never stopped then. . . The next time I saw him was one Saturday morning. I had been sick and was at home, in 1939, it was September, 1939. He drove out there in his car and

I went to the door. He was kind of frightened by me being there. He said 'I am at the wrong place.' He said 'I didn't know where you all had been living for two or three years.' He said 'I am hunting a negro' by the name of so and so. He said 'Albert, don't shoot me. I won't foot your premises again. Let me go this time and I won't never come back.' Well, it wan't but just a short time, I say a month or two, before I saw him, and he told me he was hunting my wife's brother, and I told him my wife's brother didn't live there. At that time I was working at the box factory. I was working night duty. Well, as I told you, about Friday we went to Augusta. I got back and came on to work, went to work at 7 o'clock. Well, I placed my car just in front at the door where we go in, and too where he could see it, and I got my brother to take me out near my home. Well, we left the box factory . . and I met him, met Willie Green. He was driving. . . I goes on home and places myself out in the edge of the yard. I imagine that is about 75 yards from the road. And I had my gun out there with me. Well, it wasn't five minutes that I got hid before a car topped the hill, stopped, put Willie out of the car, drove on by, and in about three or four minutes here he come right across the field. I just lay there, just to see what he was going to do first. So the shade was pulled down. He peeped in and didn't do anything, only just look in. He goes on around to the back door where it was fastened, but after he got around the kitchen window was shut, and he taken and prized that window, and it was fastened and he couldn't get it open. Then he goes up to the bedroom and tried to get in there. My wife and two children were at home, minor children. He come around in the front door, and he tries to look in the keyhole, look through. It had just a padlock on it, and he couldn't make no headway, and come around the chimney of the house where there was only one window and pulled at that to try to attract their attention, and at that time he came out. I hollered at him and I said 'Hey, there.' He reached for his gun. When he did, I shot him. As to how he reached for his gun—come back like that [indicating], with his hand to his hip. He reached for his gun before I shot, yes, sir. He had a pistol, yes, sir. That was about 7:30 at night. It was in December, 1939. As to whether I said November or December—November, 1939. The moon was shining almost as bright as day."

524

E. G. Wade testified that he was justice of the peace for Thomson district, McDuffie County, and identified a judgment rendered by him and two other justices in a commitment hearing of a charge against Albert Hinton for the alleged murder of Willie Green, the insured, in which hearing the judgment of the justices was that the accused be not bound over. This judgment was introduced in evidence by the defendant.

L. J. Norris, sheriff, testified that in response to a call he went to the home of Albert Hinton in 1933, as testified by the latter, and that Hinton was sitting in the yard with Willie Green; that Hinton informed the witness that he had caught Green in the house, and that he told Willie that he was going to give him a chance but that if he ever came back to his place he would kill him; that in 1939, about 8 o'clock, he was summoned to Albert Hinton's house, and that when he arrived Hinton was standing out in the yard and showed him where Willie Green had been standing by the window and the way he ran, Hinton stating that he did not go to the body but heard it fall, and that the witness found Willie Green dead and with a 32 Smith & Wesson in his right-hand hip pocket.

The plaintiff introduced in evidence the policy sued on and also the following documentary evidence: Letter, under date of February 5, 1940, from the plaintiff's counsel to the company stating that they had been employed to collect the double indemnity under the policy and stating: "The facts are in substance as follows: Willie Green was shot with a shotgun from which shooting he died. He was shot by Albert Hinton at the home of Albert Hinton. Albert Hinton claims to have shot Green because he, Hinton, suspected that Green had at some time in past had sexual intercourse with his wife. Hinton suspecting that Green would come to his home to see his wife, on the night Green was killed, hid himself in the yard of his, Hinton's home, and shot Green as Green approached or got about the house. Hinton was unseen by Green until the fatal shooting. The above was the contention of Hinton as appears from a preliminary hearing in the case of State v. Hinton charged with murder. The contention of the State in the case was that Hinton went to his home for the purpose of killing Green, waited for Green there until Green came and got about the house, when Hinton shot Green from ambush," etc. In that letter de-

mand was made for double indemnity of $1000 instead of $500 which had been paid by the company, with some deduction, for the death of the insured, and reply was requested as to whether or not it would be necessary to bring suit.

Letter received by the plaintiff on December 27, 1939, from the insurance company stating that the check for $500, less some deduction, could be cashed by her without prejudice of any claim for accidental death benefit, and that investigation was being made of the circumstances surrounding the death of the insured and the plaintiff would be advised further as soon as the investigation was completed.

Letter, dated February 13, 1940, from the company to the plaintiff's counsel, acknowledging receipt of their letter of February 5, 1940, above mentioned, and stating: "We have different information with regard to the circumstances surrounding the death than contained in your letter of February 5. Our position remains unchanged, and we feel there· is no liability for the accidental death benefits. This letter is written without prejudice to any of our rights or defenses in the event of litigation."

Receipt issued December 17, 1939, by the company to the plaintiff: "Received of Willie M. Green the policies enumerated and premium receipt book for transmission to the home office of the Metropolitan Life Insurance Company, with proofs of death under the said policies."

■ In order for a plaintiff to recover under a double-indemnity provision of an insurance policy for death resulting, independently of all other causes, from bodily injuries caused solely by external, violent, and accidental means, it is incumbent upon him to show that in the act which preceded the injury alleged to have caused the death of the insured something "unforeseen, unexpected, or unusual occurred." *Fulton* v. *Metropolitan Insurance Co.,* 19 *Ga. App.* 127 (2) (91 S. E. 228); *Johnson* v. *Ætna Life Insurance Co.,* 24 *Ga. App.* 431 (101 S. E. 134); *Continental Casualty Co.* v. *Rucker,* 50 *Ga. App.* 694, 695 (179 S. E. 269); *American National Insurance Co.* v. *Chappelear,* 51 *Ga. App.* 826, 829 (181 S. E. 808); *Commercial Casualty Insurance Co.* v. *Mathews,* 57 *Ga. App.* 446, 452 (195 S. E. 887); *Atlanta Accident Asso.* v. *Alexander,* 104 *Ga.* 709 (30 S. E. 939); United States Mutual Accident Asso. *v.* Barry, 131 U. S. 100 (9 Sup. Ct. 755, 33 L. ed. 60).

The evidence shows that the insured had made himself unwelcome at the home of one Albert Hinton, who suspected that he was paying improper attention to his wife. On one occasion in 1933 Hinton, returning home and observing the insured running out of his house, halted him and detained him until the arrival of a sheriff whom he had summoned. There, in the presence of the sheriff and with a shotgun which he held when halting the insured, he told the insured that he would kill him if he ever came upon his premises again. One Saturday morning in September, 1939, the insured "drove out there" in his car and Hinton went to the door. The insured was somewhat frightened and made some excuses for his presence and said "Don't shoot me. I won't foot your premises again." Hinton lived a short distance in the country from the little town in which he worked. One night in 1939 he parked his car in front of his place of business, to give the appearance of his being at work, and in another automobile was driven to his home. Armed with a shotgun, and in anticipation of a visit to his home by the insured, he secreted himself in his yard. Soon the insured was seen coming across the field of Hinton. He "peeped in," went to the back door, which was fastened, and prized and attempted unsuccessfully to open the kitchen window. Then failing to get in the bedroom, he went to the front door and tried to look through the keyhole and then "pulled at" a window by the chimney of the house. At this juncture Hinton called to him, "Hey, there," and, according to his testimony, the insured reached for his pistol which the evidence shows was found in his hip pocket, and thereupon Hinton shot him. In the circumstances thus outlined, and under the test laid down by the authorities hereinbefore cited, the jury was authorized to find that the insured's death was not brought about by accidental means. He had been warned by Hinton that he would be killed if he came upon the premises again, and yet, armed with a pistol and doubtless aware that he was risking his own life, he came to the home of Hinton when he thought that he was at work and attempted to gain entrance into his home. In such circumstances his death could reasonably be said to have been brought about by exposing himself to a danger which he knew, or ought to have known, awaited him. In other words, the jury could reasonably find that in his act of intrusion nothing "unforeseen, unexpected, or unusual" occurred, but that what should have been

foreseen and expected, the shooting of him by the master of the premises and the household, did occur.

The plaintiff in error cites and strongly relies upon *Supreme Lodge Knights of Pythias* v. *Crenshaw,* 129 *Ga.* 195 (58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St. R. 216, 12 Ann. Cas. 307). That case, however, did not involve the question of "accidental means" but only whether or not the insured's death was caused or superinduced "at the hands of justice or in violation of or attempt to violate any criminal law" under a provision of the policy that in such a case the company would not be liable for the full amount of the policy. The insured was slain by a husband, either while the insured was attempting to have sexual intercourse with the wife, or immediately after the act of sexual intercourse had been completed. It was held that the death of the insured was not so caused or superinduced. In the opinion it was said: "One who commits the offense of adultery with a married woman well knows that his life is imperiled if the outraged husband take the guilty pair in the unlawful act, or at its beginning, or at its conclusion; but it can not be said, as a matter of law, that the killing of the adulterer is the natural and legitimate consequence of the illicit intercourse between him and the wife of the wronged husband. Death may result, but it can be no more said that the death of the adulterer at the hands of the husband is the reasonable and legitimate consequence of the act of adultery than it can be said that the death of a felon at the hands of an arresting officer is the reasonable and legitimate consequence of the felony committed. Death does not follow in the ordinary sequence of events any more in the one case than in the other." It was further said: "If the insured does an act which is a violation of the law, and which he knows puts his life in peril at the time that he commits it, the company is not liable under a policy containing a stipulation of the character now before us." In reaching its conclusion that the death of the adulterer at the hands of a wronged husband can not be said to be the reasonable and legitimate consequence of the *act of adultery,* the court considered as analogous the facts of Griffin *v.* Western Mutual Asso., 20 Neb. 620 (31 N. W. 122, 57 Am. R. 848), where the insured, with an accomplice, went to the State treasury at the capitol, and presented pistols and demanded money of the treasurer, and where, after he had delivered it under such force of arms

and the insured had nearly reached the door of the capitol he was fired upon and killed by a policeman, and in which case it was held that the policy was not avoided under a stipulation that it should be void if the insured should "die while violating any law."

But the decision in the *Crenshaw* case is not, in our opinion, one which holds that in either of the cases the death of the insured could be said to have resulted from *accidental means*. It does not necessarily follow, as a matter of law or of logic, that if one can not be said to expect or foresee that his death would result from the *violation of a law* under the circumstances of either of the two cases, supra, he could not be expected to expect or foresee that his act of violating the law would result in his being killed because of some collateral or incidental act of another which his own act provoked. As we understand the philosophy and reasoning of the *Crenshaw* case, the insured's death did not result from the act of adultery but from the collateral or incidental act of the outraged husband, and in the Griffin case the insured's death did not result from the act of robbery but from the act of an officer of the law who shot to prevent his escape. If the insured in either case might reasonably be found by a jury to have known or to have anticipated that the collateral or incidental act, that of the husband in the one instance and that of the officer of the law in the other instance, would bring about his death, even though it could not be said that the *violation of the law* caused it, and the policy had provided that there could be no recovery unless in case of death by accidental means, something in the natural course of events "unforeseen, unexpected, or unusual," we apprehend that there would have been no ruling by the Supreme Court that the plaintiff was entitled to recover under the policy. In the present case no double indemnity was payable unless the insured's death was caused by accidental means. The insured was forewarned, even in the presence of an officer of the law, that if he again set foot upon the premises of the husband he would be killed. The husband had the right to forbid him to enter, and the insured's method of approach at night, in the final chapter of the drama, armed with a pistol, suggests no other opinion in the mind of the transgressor than that he was courting death at the hands of the husband. Surely in these circumstances the jury was authorized to find that his death was not caused by accidental means in the contemplation of the law, and the *Crenshaw* case is not authority to the contrary.

■ Special ground 1 of the motion for new trial assigns error on the admission in evidence of a judgment of three justices of the peace in a commitment hearing in which Hinton was not bound over under a charge of murder of the insured, it being contended that it was prejudicial, irrelevant, and immaterial to the case on trial. The plaintiff having introduced in evidence copy of a letter from her counsel in which reference was made to the contention of Hinton "as appears from a preliminary hearing in the case of State v. Hinton charged with murder," followed by a statement of the contentions of the State, the defendant, who was charged with bad faith in failing to pay under the double-indemnity provision of the policy, was entitled to show the result of that hearing, and as the court especially cautioned the jury that it was admitted only on the question of the bad faith of the defendant no error is shown.

Special ground 2 of the motion complains of a portion of the charge of the court, "The defendant contends that Mr. Green's death was not caused by accident as provided for in the policy, and that Mr. Green brought on his death by his own misconduct, and contends that he had been warned to stay away from the home of Mr. Hinton," it being urged that such conduct would not necessarily prevent the killing from being accidental, and that the charge was a statement of a contention which could not exist in law, the warning not creating a presumption that the insured would be killed if he did not heed it. The charge was a correct statement of the contention of the defendant, and no citation of authority is necessary to demonstrate that it is not error to state the contentions of a party.

Special ground 3 of the motion complains that the court erred in charging the jury "I call your attention to the fact, gentlemen, that the pleadings themselves are not evidence, but such facts as you may find to be admitted in the defendant's answer in response to the allegations of the plaintiff's petition you may consider as established facts, but with that exception the pleadings are solely for the purpose of determining the real issues involved in the case," in that it ignored the fact that the plaintiff had introduced in evidence the admission of the defendant in its answer that the insured met his death by a shotgun wound by Albert Hinton. This objection is without merit inasmuch as the charge included the statement "but such facts as you may find to be admitted in the de-

fendant's answer in response to the allegations of the plaintiff's petition you may consider as established facts."

Ground 4 of the motion complains of a charge of the court which amounts only to stating the *contentions* made in the defendant's answer and which was not error for any reason urged. It is well settled that it is not error to state the *contentions* of a party even though there be no evidence to support them.

Ground 5 of the motion complains of a portion of the charge of the court, "While it may be true that an accident is an event which takes place without one's foresight or expectation, and is undesigned, it is not true that every unforeseen, undesigned, and unexpected event is an accident. A result which though not designed, foreseen, or expected, is yet the natural and direct effect of acts voluntarily done, or of conditions voluntarily assumed, can not be said to be accidental." The charge stated a correct proposition of law applicable to the facts in issue (14 R. C. L. 1238-39) and was not subject to the objection that it expressed an opinion and was confusing to the jury. The court charged the jury as follows: "The significance of the word 'accidental' is best perceived by a consideration of the relation of causes to their effects. The word is descriptive of means which produce effects which are not their natural and probable consequences. On the other hand, an effect which is not the natural or probable consequence of the means which produced it is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, can not be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means." Special ground 6 of the motion complains that it was error for the reason that it does not properly state the significance of the word "accidental," is argumentative, and intimates an opinion of the court that by going to the home of Hinton the insured put himself in a position to reasonably anticipate that he would be killed by Hinton. The charge was a correct definition and was not subject to any objection urged. Western Commercial Travelers Asso. *v.* Smith, 85 Fed. 401, 29 C. C. A. 223 (40 L. R. A. 653) ; 14 R. C. L. 1239.

The charge of the court which is complained of in ground 7 of the motion, "There is no burden on the defendant, Metropolitan

Life Insurance Company, to prove by a preponderance of the evidence that the injury and consequent death did not result from accidental means, but that burden is upon the plaintiff throughout the trial of the case," is a correct statement of the law as to the burden of proof where recovery is sought for death by accidental means. *Travelers Insurance Co.* v. *Wyness,* 107 *Ga.* 584, 587, 588 (34 S. E. 113) ; *Continental Casualty Co.* v. *Rucker,* supra, *New York Life Insurance Co.* v. *Jennings,* 61 *Ga. App.* 557, 559 (6 S. E. 2d, 431) ; *Schneider* v. *Metropolitan Life Insurance Co.,* 62 *Ga. App.* 148 (7 S. E. 2d, 772) ; *Riggins* v. *Equitable Life Assurance Society,* 64 *Ga. App.* 834, 835 (14 S. E. 2d, 182).

The charge of the court complained of in ground 8 of the motion, "I charge you, gentlemen of the jury, that the word 'assault' within the meaning of the accident clause of this policy, which would relieve the insurance company from liability for injuries or death inflicted during such an altercation, imports causation, aggression, or fault on the part of the insured. And the exemptions of the character under consideration relieve the insurer from liability if the insured was injured while voluntarily fighting or during an involuntary fight brought on wholly or partially by his fault, that is, a fight for which he was partly responsible, either as a volunteer or as a rash speaker or wrongdoer, as distinguished from acts done in self-defense," is not subject to the objection, in effect, that it was inapplicable to the evidence. The court in immediate connection with the excerpt objected to charged the jury: "I charge you, gentlemen, it is entirely a question for you to determine whether from the evidence in this case whether that condition applies." Albert Hinton, who shot the insured, testified that when he called out to the insured, who was trying to enter Hinton's house, as the jury might find, the insured made a motion as if to draw a pistol from his hip pocket, whereupon he was shot by Hinton, and a pistol was in fact found in the insured's hip pocket. See *Gresham* v. *Equitable Ins. Co.,* 87 *Ga.* 497, 500 (13 S. E. 752).

The court charged the jury: "I charge you that if the insured in this case did something which culpably provoked or induced the act causing his injury and death, then the result is not accidental, but if Willie Green, the insured, was wholly free from culpability himself the result was accidental as to him." Special ground 9

of the motion assigns error on the grounds that it was contrary to the terms of the policy as to payment of double indemnity in case of death by accidental means unless sustained while the insured was committing an assault or participating in a felony, and virtually instructed the jury to return a verdict for the defendant since the evidence was to the effect that the insured was at the home of the slayer for the purpose of having illicit relations with his wife. Almost immediately following the excerpt complained of the court charged: "I charge you, if you believe that at the time the insured was injured he was violating a law, there must be a causative connection between the act which constituted the violation of the law and the death of the insured." The charge was not error for the reason assigned and was applicable to the evidence and authorized by *Gaynor* v. *Travelers Insurance Co.*, 12 *Ga. App.* 601, 603 (77 S. E. 1072), *Travelers Insurance Co.* v. *Wyness*, supra; and *Newsome* v. *Travelers Insurance Co.*, 143 *Ga.* 785 (85 S. E. 1035).

The charge complained of in special ground 10, "I charge you that an insured who meets his death in an affray in which he is the aggressor must be held to have foreseen the result of his wrongful act or must have known or anticipated the results; he must have known from observation and experience that he would receive an injury," was a correct statement of the law as to accidental means and was applicable to the case under the evidence that the insured endeavored to draw his pistol when called to by the slayer, and was not objectionable for the assigned reason that it put the insured in the light of a wrongdoer and eliminated from the jury a consideration of whether under the evidence the insured was defending himself against an assault by the slayer.

The charge of the court complained of in ground 11 of the motion, "I charge you that it is incumbent on the plaintiff to show by a preponderance of the evidence that the insured, Willie Green, was unaware of any danger whatsoever, as stated in her petition. If she fails to show that the said Willie Green was unaware of his danger, or if it is shown that Willie Green was aware of any danger whatsoever, then I charge you the plaintiff can not recover in this case, and your verdict should be for the defendant," was a correct statement of the law as to the burden of proof being upon the plaintiff to show death by accidental means under the authorities

hereinbefore cited, and was not error for the assigned reason that it precluded recovery where the insured was "ambushed" and had an alleged right to defend himself.

The charge of the court complained of in ground 12 of the motion, "I charge you that it can not be that one of the risks covered by a contract of insurance is the crime of the insured. There is an implied obligation on his part to do nothing to wrongfully accelerate the maturity of the policy. Public policy forbids the insertion in a contract of a condition which would tend to induce crime, and as it forbids the introduction of such a stipulation it also forbids the enforcement of a contract under circumstances which can not be lawfully stipulated for," is not subject to the objection urged that it was contrary to the pleadings and evidence and was misleading, but is supported by Burt v. Union Central Life Insurance Co., 187 U. S. 365 (23 Sup. Ct. 139, 47 L. ed. 216), and Supreme Commandery K. of G. R. v. Ainsworth, 71 Ala. 436, 447 (46 Am. R. 332). The policy sued on provided that the additional death benefit should not be payable if the insured's death was the result of participation in an assault or felony, and under the testimony of Hinton the insured endeavored to shoot him when he found that his presence at the home of Hinton had been detected.

Ground 13 of the motion complaining of a portion of the charge of the court that, in effect, the burden was on the plaintiff to prove death by accidental means is without merit, and is controlled adversely to the plaintiff by the ruling on special ground 7, supra.

Grounds 14, 15, and 16 involve questions of law hereinbefore dealt with, as conceded by the plaintiff, and are without merit.

The court did not err, as complained of in ground 17 of the motion, in charging the definition of justifiable homicide as given in Code § 26-1011. According to the contention of the plaintiff, if the insured attempted to draw his pistol when called to by Hinton he was acting to defend himself, and, according to the contention of the defendant, the insured endeavored to draw his pistol when finding that his presence had been detected, whereupon he was shot by the owner of the premises.

The charge of the court complained of in ground 18 of the motion, "I charge you, gentlemen, that it would be justifiable homicide to kill to prevent a felony upon one's habitation or property or

under such circumstances, of which the jury are the sole judges, as would arouse the fears of a reasonable man or woman that a felony was about to be committed against his or her property or habitation or person," was not error for any reason assigned but was applicable under the facts of the case.

The court charged the jury: "I have allowed in evidence the results in an investigation by three justices of the peace in a criminal proceeding against Mr. Hinton. I admitted that before you, gentlemen, for one purpose only, and that one is for you to determine whether or not the company acted in bad faith or whether there was any bad faith on the part of the company in failing to pay the claim. If you should find under the evidence that the company should pay this claim, you are not to consider the findings of the justices of the peace as to the guilt or innocence of the party involved. That is not the issue before you, gentlemen, but, as I stated, I admitted that solely for your consideration on the question of bad faith on the part of the company, as to whether or not it acted in bad faith." In special ground 19 of the motion error is assigned on the grounds that it was confusing to the jury and inferentially authorized them to consider the findings of the justices while determining whether or not the company was liable. The charge expressly instructed the jury that if they found that the claim should be paid their conclusion should not be affected by the findings of the justices as to the guilt or innocence of the accused slayer, and that the judgment was admitted solely on the question whether or not the company acted in bad faith. The objection is not well taken.

The court did not err in failing to charge without a request as complained of in ground 20 of the motion: "If Hinton knew of the infidelity of his wife, knew that the insured had been frequenting his home for the purpose of seeing his wife, if Hinton set a trap for the insured, intending to kill the insured if he found him at his home, in the trap so set, and if on finding the insured at his home the insured reached for his pistol to defend himself against Hinton who sought to kill him, such reaching for his pistol on the part of the insured would not constitute an assault, but he, the insured, would have the right to defend himself as against the deadly assault being made upon him by Hinton, and the killing of the insured on the part of Hinton would be murder, and

accidental in so far as the insured was concerned, in contemplation of the terms of the policy." Such a charge would. have been inapplicable and unauthorized under the evidence.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*