## 49690. LIBERTY NATIONAL LIFE INSURANCE COMPANY v. MORRIS et al.

ARGUED SEPTEMBER 4, 1974 — DECIDED SEPTEMBER 20, 1974.

*Henry A. Stewart, Sr.,* for appellant.
*Fudger & Foster, Arthur W. Fudger,* for appellees.

WEBB, Judge.

It was the first day on a new job for Dean Morris. This 38-year-old bachelor was taken by Joe Earl Hicks, his employer, at early morning on March 25, 1969 to a densely wooded area between Dallas and Yorkville in Paulding County where Hicks had a moonshine liquor still. They had with them some vienna sausage, pork and beans, crackers and cheese. About two o'clock Hicks went back to his house to get some more jugs, leaving Dean at the still alone. Neither had eaten lunch. When Hicks returned in about an hour he found Dean "laying right in front of the dam where you put your radiator, face down . . . I shook him and seen that he was already dead then . . ." Hicks said he was scared, but he went ahead and called the sheriff anyhow. As it was Dean's first day, it also was his last!

Dean Morris had three accidental death policies from Liberty National Life Insurance Company, for $100 issued in 1951 for a weekly premium of 5 cents, for $2,000 issued in 1955 for a weekly premium of 10 cents, and for $500 issued in 1958 for a weekly premium of 35 cents. Bertha F. Morris and William R. Morris, his parents, were the beneficiaries. Each of the policies defined death from accidental means to be "from bodily injuries sustained solely through violent, external and accidental means." Each policy further provided that "no such accidental benefit shall be payable if death result . . . from

participating in an assault or felony, or directly or indirectly from bodily or mental infirmity or disease in any form . . ."

Two physicians testified by depositions. Dr. Samuel U. Brawley testified that he had treated Dean for cirrhosis of the liver and ulcers, and last saw him on an office visit on March 5, 1969. He testified that his office record contains no mention of any suspected heart condition, and that "I have no memory suspecting that he had a heart condition." He said Dean had a low hemoglobin, and he thought Dean was bleeding from the stomach or esophageal varices, for which he gave Dean iron. Dr. Brawley further testified that he did not have occasion to examine Dean Morris at the time of his death or perform an autopsy on his body.

The other physician testifying was Dr. John Covington, medical examiner for Paulding County. In such capacity he was taken by the sheriff to the death scene to examine the body of Dean Morris. "[W]hen we got there we found this still down along beside the creek they were actually making spirits . . . I guess you would call it. At the lower end of the still . . . it would come through the coil there was a bucket setting there at the end of a pipe and this pipe was in the creek, and there was a body [Dean Morris] laying face down right beside this bucket and his face was in the water . . . it was a completely deceased body without any evidence of any living activity, it was already cold by this time and it had a bluish discoloration of the face." An ambulance was called to take the body to the hospital in Dallas where Dr. Covington performed an autopsy.

Dr. Covington further testified that in that area other than the still "we noticed where the men had been working there, where they had brought in their own little snacks for eating. This consisted of such things as crackers, pork and beans, vienna sausage, and things of this nature, just little knickknacks. We also noticed several gallons of alcohol setting around in these gallon milk jugs, plastic milk jugs. And at the top of the hill we also found a barrel that had been filled approximately half full of alcohol."

As to his autopsy, Dr. Covington testified: "We

examined the body completely, undressed the body and examined it for any evidence of external physical marks and this type of thing. The first thing of significance on the examination was that the abdomen was distended and *there was coffee ground material in his mouth.* I made a wide incision in a routine manner to open the chest and abdomen. On gross examination the lungs were found to be well aerated but on cross section a bloody liquid extruded from the cut section. The heart was not extremely enlarged but it seemed that the coronary arteries were not disturbed and they were sent along with the heart to the crime lab. The esophagus was examined and there were several esophageal varices *but none were ruptured.* Examination of the abdominal organs, I found the liver to be somewhat enlarged and somewhat hard and it had a yellowish discoloration. The remaining organs appeared to be normal. This was on the gross examination. I had the crime lab perform the pathological examination and the tissue would be sent to them. Blood also was drawn and sent to the pathology lab." (Emphasis supplied.)

According to Dr. Covington, "The coffee ground material" was "just foreign debris that you normally don't see in a person's mouth . . . It was foreign to the body because on examination at the crime lab it was a non-cellular structure . . . it wasn't viable material of any kind . . . *it had to be ingested or injected from some other means than coming from the body itself.*" (Emphasis supplied.) "[O]n the pathological study performed at the crime lab, *the microscopic showed this type debris within the bronchia of the lungs.*" (Emphasis supplied.)

Dr. Covington further testified that based on his examination, and autopsy performed on the deceased, he was of the opinion that death was caused by "anoxia, probably secondary to aspiration and regurgitation of foreign material," that anoxia is the lack of oxygen, that food eaten such as he described as being present at the scene of death, and the coffee-like grounds, could have caused regurgitation, could have been the material that was aspirated into the lungs, and could have caused the death.

Dr. Covington also testified that preliminarily he

showed the cause of death to be congestive heart failure, but that he reached the final conclusion that anoxia was the cause of Dean's death based on the result of examination by the State Laboratory, "plus the stuff that was in his mouth." He also testified that at the time of his examination there was no evidence of the deceased having been intoxicated, that "there was no alcohol in his blood," and that the operation of a whiskey still had nothing to do with the death of the deceased as "this death could have occurred anywhere." "[H]e did not suffer a heart attack. We have ruled that out as well as the esophageal varices."

Hubert A. Martin, funeral director who went to the scene of the death to remove the body, testified that Dean Morris "was laying face down in the edge of the stream and he was wet. I think he had possibly fallen in the stream."

Sheriff J. K. Skipp, a witness for Liberty National, testified he had been called by Hicks, and that upon his arrival at the scene "He [Dean Morris] was lying in the stream below what you call a hole of water that they use to condense the whiskey, and he was lying face down in this stream."

Liberty National moved for a directed verdict, both at the conclusion of the evidence on behalf of the insured's parents and at the conclusion of all the evidence, on the grounds that the insured did not suffer an accidental death under the terms of the policies, and was in the commission of a felony. Each motion was denied. Following a verdict for the insured's parents and beneficiaries, Liberty National filed its motion for judgment notwithstanding the verdict and motion for new trial, both of which were denied. The denial of these motions constitutes Liberty National's enumeration of errors.

Liberty National's contentions, succinctly stated, are as relied upon in their motions, namely, (1) the insured did not suffer an accidental death within the terms of the policies, and (2) the insured was in the commission of a felony at the time of his death, contrary to the terms of the policies. Sustaining either ground would preclude recovery by the beneficiaries.

1. Liberty National's first contention is that the insured did not suffer an accidental death within the terms of the policies.

Counsel for both appellant and appellees suggest the scarcity of Georgia cases directly in point. The closest akin is that of *Life & Cas. Co. of Tenn. v. Brown,* first decided by this court (95 Ga. App. 354 (98 SE2d 68)). The provision of the policy material to our consideration reads in part: "Upon due proof that the death of the insured occurred in consequence of bodily injury effected solely through external, violent and accidental means of which, except in case of drowning or of *internal injuries revealed by an autopsy,* there is *a visible contusion or wound on the exterior of the body . . .*" (Emphasis supplied.) The insured, while eating his Monday meal, experienced severe pain in the abdominal region, and his physician found he was suffering from acute but uncomplicated appendicitis. Approximately 7 hours later, he was prepared for an appendectomy. While being administered ether, he vomited and certain food particles in his stomach, which had not been digested and which had not been sufficiently masticated, lodged in his windpipe and stopped the flow of oxygen to his brain for such a length of time that it was irreparably damaged. Such injury to his brain was externally revealed by cyanosis — a bluish tint to the skin. From the injury thus inflicted he died four days later.

By general demurrer there was presented the question of whether or not these facts alleged death by accidental means under the terms of the policy so as to result in liability against the insurance company. This court held that the complaint did set forth a cause of action. The Supreme Court reversed, holding that the complaint did not state a cause of action because there was no allegation that the internal injury was revealed by an autopsy or by a wound or contusion on the exterior of the body, conditions of proof under the policy. Said the Supreme Court (213 Ga. 390, 391 (99 SE2d 98)): "Conceding, but not holding, that the amended petition is sufficient to show that the insured died from an injury effected solely through external, violent and accidental means, and independent of all other causes, *still there*

*would be no liability under the policy unless the internal injury* from which he died *was revealed by an autopsy* or by a wound or contusion on the exterior part of his body. There is no allegation that an autopsy was performed . . ." (Emphasis supplied.)

In the case sub judice, there is no requirement in the policies that there be a wound or contusion on the exterior of the body, or that the internal injury be revealed by an autopsy. Nevertheless, there was an autopsy performed which revealed that there was "coffee ground material in his mouth . . . a foreign debris that you normally don't see in a person's mouth . . . On examination at the crime lab it was a non-cellular structure, . . . it wasn't viable material of any kind . . . The microscopic showed this type debris within the bronchia of the lungs," that this foreign material "had to be ingested or injected from some other means than coming from the body itself," and that death was caused by "anoxia, probably secondary to aspiration and regurgitation of foreign material."

"Insurance against injury caused by accidental means permits recovery for the unusual and unexpected results of an unintentional act even though such results occur without mischance, slip, or mishap. For example, it is held that there is harm caused by accidental means . . . when the insured chokes to death while attempting to swallow a piece of beefsteak." 10 Couch on Insurance 2d § 41:38, citing American Acc. Co. v. Reigart, 94 Ky. 547 (23 SW 191, 42 ASR 374, 21 LRA 651).

"There are numerous cases of death or disability incident to the partaking of food or drink and resulting either from poisoning or from disease. In the case of death or disability resulting from the mechanical action of food or drink, the cases are largely agreed that it was by accident or the result of accidental means." Couch, supra, § 41:61.

"The great majority of courts have held that choking upon some object of food, or its becoming lodged in some portion of the body, in such a way as to produce death, is produced by accidental means, and recovery may be had." 1A Appleman, Insurance Law and Practice, § 464.

A leading case is Peoples Life Ins. Co. v. Menard, 124

Ind. App. 606 (117 NE2d 376), involving an insured who died in his bathroom shortly after eating supper with his wife and baby. "It was determined by the medical testimony that the immediate cause of decedent's death was asphyxiation due to choking on regurgitated food and that such asphyxiation was caused by the accidental lodging in decedent's larynx of two small pieces of 'Prem' meat . . . and also some soft food material and some greenish material like spinach. There was moderate congestion of the mucous membrane of the larynx and trachia and the lung changes appeared secondary to the asphyxiation."

Menard's insurance policy provided for double indemnity upon proof that the death "resulted in direct consequence of bodily injuries effected solely and independently of all other causes through external, violent and accidental means . . . of which [injuries] there is a visible contusion or wound on the exterior of the body."

The Indiana court held that the jury could properly have concluded that the lodging of the food in the decedent's windpipe was the accidental means causing his death. The court continued: "Indiana is in accord with the majority rule of other jurisdictions in this country that draw a distinction between the terms 'accidental means' and 'accidental death' or 'accidental result.' Our own decisions, with the weight of decisions of other courts, hold that an accident within the meaning of an accident insurance policy providing for liability on the death of the insured by accidental means must include the requirement that the means or cause of the death was accidental and though an accidental result may occur, it is not sufficient under this type of policy, but the means must be accidental.[1] [Cits.]

"If the regurgitation had been a perfectly normal process as it normally occurs the decedent would have expelled the contents of his stomach in a perfectly normal

---

[1] In accord: *Johnson v. National Life & Acc. Ins. Co.*, 92 Ga. App. 818 (90 SE2d 36); *Green v. Metropolitan Life Ins. Co.*, 67 Ga. App. 520 (1), 525 (21 SE2d 465).

manner and no unforeseen, unexpected or unusual contingency would have occurred, and decedent would not have suffered the asphyxiation which was the immediate cause of his death. Normal regurgitation results in no untoward, unforeseen happening as in the instant case. Here the food became lodged in the windpipe of the decedent creating a localized abnormal condition of the living body and resulted in his death. The accidental means, to wit: the lodging of food, which was accidental and contrary to nature, thereby caused a perfectly normal healthy person to die."

Liberty National contends that aspiration does not constitute accidental means "and such does not constitute external means but rather the cause is internal." Four cases in support of this argument are offered, McCallum v. Mutual Life Ins. Co. of N. Y., 274 F2d 431 (CA 4); Radcliffe v. National Life & Accident Ins. Co., 298 SW2d 213 (Tex. Civ. App.); Towner v. Prudential Ins. Co. of America, 137 S. 2d 449 (La. App.); and Strowmatt v. Volunteer State Life Ins. Co., 176 S. 2d 563 (Fla.)

In the McCallum case, the immediate cause of death was suffocation due to aspiration of vomitus. *"There was no 'mechanical lodging of food in the windpipe.'* The pathological diagnosis . . . revealed 'acute aspiration of gastric contents to trachea, bronchi and bronchioles' . . . death of the insured was not a direct result of bodily injury effected through external means within the meaning of the double indemnity provisions of the insurance policies." (Emphasis supplied.) The Circuit Court of Appeals affirmed and adopted the opinion of the District Court (175 FSupp. 3), which disagreed with the Menard (124 Ind. App. 606, supra) decision. "To the extent that Menard may support an 'external means' where food has passed into the stomach and regurgitated after changing into matter, this court disagrees. The substance, as contained within the stomach, was inside the body and on its way outside during the vomiting process. This, in no sense, constitutes an 'external means.' "

The Civil Court of Appeals of Texas in its Radcliffe decision also disagrees with the Indiana court. The

Radcliffe infant's death was caused by aspiration of vomitus regurgitated from the stomach. The court held that the death of the infant, ill with measles, was not effected solely through "external means" within the terms of the policy, since even if aspiration of vomitus was accidental, its regurgitation was neither external nor accidental. The cause of the regurgitation had not been determined. Subsequently the same Texas court in Jones v. Aetna Life Ins. Co., 439 S. W. 2d 721,727 (Tex. Civ. App.) said that the Radcliffe case stands solely for the proposition that the death did not result from violent or external means within the terms of the policy involved in that case. Justice Langdon, speaking for the court in the Jones case, said: "Aspiration is not the natural and usual effect of vomiting. It was an independent cause or agency which intervened to produce the injury to the lungs of Mr. Jones. Vomiting in itself produced no injury. The aspiration which was unusual, unexpected, and so extraordinary and rare in persons of the age [34] and physical condition of Mr. Jones clearly makes his death an accidental one . . . The act of vomiting and the aspiration were unexpected, unforeseen and improbable. He undoubtedly was seeking fresh air and survival when he went to the front door of his home and fell."

The Court of Appeals of Louisiana in the Towner case held that where the insured's death was due to asphyxiation of vomitus, the death was not effected "solely by external means" within the provisions of the policy. There was no autopsy, and the evidence did not indicate whether asphyxiation was brought about by the aspiration of food or by the aspiration of mucous. "Moreover, the substance which the decedent aspirated actually has lost its identity as food, or as something which had been introduced into the body from the outside. Because of this distinction between the instant suit and the Reigart[2] case we think the latter is not

---

[2] American Acc. Co. v. Reigart, 94 Ky. 547 (23 SW 191), supra, holding there is harm by accidental means when an insured lost his life by eating a piece of beefsteak which, as decedent was attempting to swallow it,

applicable here . . . a different result might be reached in a case where death results from regurgitation and aspiration of vomitus brought about by sudden trauma or by the consumption of noxious substances."

In the Strowmatt case, the fourth decision cited by Liberty National, a District Court of Appeal of Florida held that death caused by asphyxia due to aspiration of vomitus in the trachea was not effected through "external means" within the accidental death benefits of a life policy. An autopsy was performed, and the cause of death was determined to be asphyxia due to aspiration of vomitus in the trachea. Chemical analysis of the blood and contents of the stomach showed excessive quantities of alcohol and barbiturates. The court held: "The decision in this case depends on an interpretation of the words 'external means.' It is recognized that death caused by choking on food in an attempt to swallow same which accidentally passes into the lungs is the result of external, violent and accidental means. However, aspirated vomitus matter is not food."

Both the McCollum and the Radcliffe decisions seem to give some emphasis to the fact that regurgitation is the expelling of some substance from the stomach to the outside, that is, it was inside the body on its way out, and therefore cannot be external, and is not accidental. A seed from a ripe plum inadvertently swallowed that lodges in the windpipe on the way down and producing anoxia would be external and accidental. If, however, that seed went on into the stomach, was regurgitated and then lodged in the windpipe producing anoxia, under the McCollum and Radcliffe reasoning, the seed being "inside the body and on its way outside during the vomiting process" would not be external means! We cannot follow that rationale.

"Policies commonly qualify the concept of accidental means by adding the requirements that such means be external and violent. Where it may be inferred that the act which preceded the injury was something unforeseen, unexpected, and unusual, and that the injury resulted

accidentally passed into his windpipe choking him to death.

directly and immediately therefrom, it is produced by external, violent and accidental means . . . The concept of 'external' requires only that the cause of death or injury be external to the person, although the cause may act internally. 'Violent' refers to some act not occurring in the ordinary run of things. And death is 'violent' within an accident policy if it results by reason of an external agency and is not in the ordinary course of nature." Couch, supra, §§ 41:39, 41:40, 41:41.

"Where an insurance policy provides for double indemnity for accident, caused solely through external, violent, and accidental means, the burden is upon the plaintiff to show that in the act which preceded the injury alleged to have been sustained by the insured, something unforeseen, unexpected, or unusual occurred. 'In other words, the act which preceded the injury itself must have been an accident.' *Continental Cas. Co. v. Rucker,* 50 Ga. App. 694, 696 (179 SE 269)." *Johnson v. National Life & Acc. Ins. Co.,* 92 Ga. App. 818 (90 SE2d 36); *Family Fund Life Ins. Co. v. Wiley,* 91 Ga. App. 225 (85 SE2d 448); *Thompson v. Prudential Ins. Co. of America,* 84 Ga. App. 214, 218 (66 SE2d 119); *Green v. Metropolitan Ins. Co.,* 67 Ga. App. 520, 525 (21 SE 465); *Johnson v. Aetna Life Ins. Co.,* 24 Ga. App. 431 (101 SE 134); *Fulton v. Metropolitan Ins. Co.,* 19 Ga. App. 127, 128 (91 SE 228).

The injury was death by anoxia. The accident preceding the death, and constituting accidental means, was the "coffee ground material," or "foreign debris" that "could have been . . . aspirated into the lungs and could have caused the death" (Dr. Covington's testimony). This was something unforeseen, unexpected, and unusual. This material found within the bronchia of the lungs came from the outside, externally. Dr. Covington, who performed the autopsy, testified that the coffee ground material "was just foreign debris that you normally don't see in a person's mouth . . . it wasn't viable material of any kind . . . it had to be ingested or injected from some other means than coming from the body itself."

The test whether death is by accidental means, within the policy provisions, is a fact question to be determined by the jury. "Where one is insured against

'personal bodily injuries, effected . . . through external, violent and accidental means,' and there is evidence tending to show that an injury received by the insured resulted from such means, *the jury should determine,* as a question of fact, whether the injury did result from accidental means." *Atlanta Accident Assn. v. Alexander,* 104 Ga. 709 (30 SE 939). (Emphasis supplied.) Couch, supra, § 41:39. In the case sub judice, the issue was submitted to the jury, and there was sufficient evidence to sustain the verdict.

2. Liberty National's second contention that recovery is barred because the insured was in the commission of a felony at the time of his death is without merit.

There must be some causative connection between the insured's act and his death or injury. Two of the policies here provide that "no such accidental benefit shall be payable if death *result from* . . . participating in an assault or felony . . ." (Emphasis supplied.) The other policy excludes coverage for "loss *which results from* . . . the Insured's commission of, or attempt to commit, an assault or felony." (Emphasis supplied.) Making moonshine liquor is a felony. Code Ann. § 58-206. The evidence clearly shows that Dean Morris was engaged in making moonshine liquor. Equally clear was that Dean's work at the liquor still was not the cause of his death. Dr. Covington testified: "Q. Doctor, as a result of your examination at the scene and also your autopsy, from a medical standpoint did the operation of a whiskey still have anything to do with the death of the deceased? A. No, this death could have occurred anywhere." Dr. Covington further testified, "[T]here was no alcohol in the blood."

"The provision in a policy of insurance that, 'if the insured shall, within one year from the date hereof, die as a result of a violation of the law,' the amount payable under the policy shall be confined to the premiums which have been paid, with interest thereon, will not defeat or prevent the recovery of the full amount of the policy, *unless,* it appears that *the violation of the law* on the part of the insured *was the direct, natural and legally proximate cause of death. "* (Emphasis supplied.) *Empire*

*Life Ins. Co. v. Einstein,* 12 Ga. App. 380 (5), 386 (77 SE 209).

"A provision in an insurance policy that the insurer shall be exempt from liability if the death of the insured be 'sustained in connection with violation of law by the insured' bars recovery under the policy if the violation of the law is shown to have a causal connection with his death." *National Life & Accident Ins. Co. v. Sutherland,* 64 Ga. App. 72 (1), 78 (12 SE2d 183); *Green v. Metropolitan Life Ins. Co.,* 67 Ga. App. 520, 525, supra.

A stipulation in the policy "that the insurance company 'shall not be liable for death occurring while in the commission of . . . some act in violation of any law' . . . must be construed reasonably, and the insurance company is not absolved from liability unless the death of the insured is the reasonable and legitimate consequence of the unlawful act." *North Carolina Mutual Life Ins. Co. v. Evans,* 38 Ga. App. 178 (143 SE 449); also 39 Ga. App. 774 (148 SE 345); Couch, supra, § 41:636.

Note well the language in these three policies — "if death *result from participating* in an assault or felony . . ." (Emphasis supplied.) "The majority rule is to the effect that there must be a causative connection shown between the violation of law and the injury received; and in the absence of a showing that such violation was the direct and proximate cause of the injury, recovery would not be denied." 1A Appleman, supra, p. 271, § 511.

"[T]he mere fact that the accident occurred while the insured was engaged in a violation of law does not exonerate the insurer unless violation of law was the cause of, or had some causative connection with, the accident." Couch, supra, § 41:632.

The general rule is "that there must be more than a bare violation of the law; it has been held that a sufficient causal relationship was not established by proof that at the time the insured suffered the harm he was guilty of . . . committing adultery or fornication, even though insured was killed during the act." Couch, supra, § 41:643. "There must be something in the act itself, independent of other circumstances, which makes the death the reasonable consequence." *Supreme Lodge, K. P. v. Crenshaw,* 129 Ga. 195, 201 (58 SE 628, 121 ASR 216,

12 AC 307, 13 LRA 258).

We find no error, and the judgment is affirmed.

*Judgment affirmed. Pannell, P. J., and Evans, J., concur.*