## 53633. LIFE INSURANCE COMPANY OF VIRGINIA v. McDANIEL.

WEBB, Judge.

Thomas B. McDaniel, deceased husband of the plaintiff in this action, was riding his motorcycle with a friend on April 25, 1975, when he lost control and the motorcycle landed on top of him with the handlebar thrust into his right side, causing intense pain. He was hospitalized the next afternoon when the abdominal pain intensified, and exploratory abdominal surgery was performed. During the operation his pulse was rapid and it increased after surgery, becoming "extremely fast." He was treated primarily with drugs for his heart, but did not respond and died shortly after midnight on the fourth day after admittance. An autopsy confirmed that the cause of death was pulmonary embolus.

McDaniel had previously suffered from pulmonary embolus, with a history of forming blood clots in his leg. The insurer refused to pay accidental death benefits under the policy insuring McDaniel's life and Mrs. McDaniel, as primary beneficiary, brought this action seeking recovery of $5,000, the amount of the accidental death benefit under the contract, plus 25% bad faith penalties and attorney fees. The trial judge denied the insurer's motion for directed verdict and the jury returned a verdict for Mrs. McDaniel for $5,000 on the insurance policy, $1,250 for bad faith penalties and $1,400 attorney fees. The insurer appeals and we reverse.

The insurance contract here provided in pertinent part for accidental death benefits "Upon receipt at its Home Office of due proof that the Insured has, . . . died as the result, directly and independently of all other causes, from bodily injuries caused solely by external, violent and

accidental means. . . No payment shall be made under this provision if the Insured's death results, directly or indirectly, wholly or partially, from: . . . (b) disease or bodily or mental infirmity or medical or surgical treatment therefor. . ."

Under such provisions this court has consistently held that if the insured's death was contributed to or caused by disease or bodily infirmity the plaintiff was not entitled to recover (*Harris v. Metropolitan Life Ins. Co.*, 66 Ga. App. 761 (19 SE2d 199) (1942)), and that the burden of proving liability on the part of the defendant was on the plaintiff. *Green v. Metropolitan Life Ins. Co.*, 67 Ga. App. 520 (21 SE2d 465) (1942) and cits.; *Prudential Ins. Co. v. Kellar*, 213 Ga. 453 (99 SE2d 823) (1957); *Interstate Life &c. Ins. Co. v. Upshaw*, 134 Ga. App. 394, 398 (214 SE2d 675) (1975).

The evidence introduced here to establish the insurer's liability was primarily the testimony of Dr. Knowlton, McDaniel's attending physician. He stated on direct examination that McDaniel sought medical attention when his abdominal pain following the motorcycle accident became severe; and that McDaniel's hospital admission examination recorded "large varicosities on both legs" and "previous difficulty with pulmonary blood clot." Testimony as to the exploratory abdominal surgery was as follows: "A. . . . [W]hen we opened his abdomen, we found a bluish discoloration of the tissues in the back of the abdomen, an area we call the retro-peritoneal space. We explored the retro-peritoneal space and found several minor blood vessels had bled and caused a collection of blood in this area. Q. Did you have an occasion to treat him after this operation? A. Yes, sir. Prior to the surgery, in consultation with Dr. Hay, it was decided that since the patient had had previous difficulty with pulmonary embolus, or blood clot, going through his vena-cava to his lung, that a ligation of the vena-cava was needed to prevent this from becoming a post-operative complication, and so at the time of surgery, a vena-cava ligation was done also. Q. Now you've testified that you had knowledge that he had a previous history of a pulmonary embolus? A. Yes, sir. Q. How did you obtain that previous history, please? A. Both from his medical

records and from a discussion with Dr. Hay, Dr. Setzer, who had attended him previously, and from the patient. Q. Would you tell us what a pulmonary embolus is? A. This is a blood clot that lodges in the blood vessels of the lung. The origin is usually from the leg and in this particular patient, he had a history of forming the blood clots in his leg, so we were relatively certain that his blood clot had come from his leg . . . Q. Do your records reflect when was the first time that you or a member of the Toccoa Clinic first had any knowledge as to the time [of] Mr. McDaniel's complaint as to pulmonary embolus? A. The records indicate that he was treated in February of 1973, and felt at that time to have a pulmonary embolus. Q. Following the inferior vena-cava ligation, what, if anything else did you do for Mr. McDaniel? A. That essentially was the surgical treatment. Q. Now, can you tell us what, if anything, happened to Mr. McDaniel? A. He was transferred from the recovery room to the intensive care unit of Stephens County Hospital. During his operation, he had a rapid pulse which was one of our indications for proceeding with surgery. In the recovery room his pulse became a little more rapid and several hours after surgery, his pulse became extremely fast. He was treated medically, primarily by Dr. Hay, with drugs for his heart and did not respond and progressed to his death which was shortly after midnight. Q. Of what night, please? A. That was—it was 12:25 a. m. on April 30, 1975. Q. With reference to your description of the rapid increase of the pulse rate, what would cause that? A. The most likely cause was a pulmonary embolus clinically, and, of course, in this particular case this was confirmed by autopsy as being pulmonary embolus . . . Q. Based upon your examination and treatment of Mr. McDaniel, and based upon the operation that you have previously described, do you have an opinion with a degree of reasonable medical certainty as to the cause of Mr. McDaniel's death? A. The cause of death was pulmonary embolus. Q. In you opinion, did the death of Thomas B. McDaniel result either directly or indirectly, wholly or partially, from pulmonary embolus? A. His death was directly from the pulmonary embolus."

On cross examination the following testimony

ensued: "Q. Doctor, going back to a couple of questions that you've just answered for Mr. Dickerson, would you please tell the jury what you meant when you said that the pulmonary embolus was the cause of death? A. This was the event that caused Mr. McDaniel to die. Q. This was the immediate causative factor that resulted in his death? A. Yes, sir . . . Q. And is it a fair statement to say that the trauma of the accident to this tissue caused the bleeding in your opinion? A. Yes, sir. Q. Did you in this exploration of his abdomen find any emboli or blood clots? A. No, sir, if we had previously found that he had problems in his leg vein, and we would not really expect to find a blood clot in the abdominal portion of the exploration. When we did the vena-cava ligation, we specifically looked for this because if there had been a clot in his vena cava, it could easily have been dislodged and, so, looking for it was an integral part of the operation, or the important part. Q. In other words, you were concerned that a blood clot might be present in the leg or someplace in the vena-cava artery or vein? A. Vein. Q. And you performed the vena-cava ligation which, I believe, consists of the tying of the vena-cava cavity, or constricting it to a certain extent so as to reduce its diameter so that it might prevent the passage of a blood clot through the place where it is tied, or ligated, is that correct? A. That is correct. Q. Now why is it important to stop a blood clot at this point, that is, somewhere in the abdomen? A. Well, if a large blood clot is allowed to go through to his lung, the mortality rate per blood clot is estimated to be 25%. This man had demonstrated clinically in the past that he had blood clots. He had a tendency for blood clots, and we felt that the necessary period of immobilization following surgery where he would be in bed most of the time would markedly increase the likelihood of his forming another blood clot, or dislodging another blood clot, so we felt that it was really a life-threatening situation to have to operate on such a patient . . . Q. Isn't it true that varicose veins predispose one to the formation of blood clots? A. Yes, sir. . . Q. I'll ask you this question based upon your history of the accident which you have had and your knowledge of Mr. McDaniel's condition, how likely was it that a thrombosis would have formed in the vein without the

injuries he sustained in the motorcycle accident? A. Well, with the history of his having formed clots or thrombosis before, there . . . a very definite possibility existed of him forming them spontaneously . . . Q. Doctor, can you or can you not say that the condition of Thomas B. McDaniel, that is, the condition that you have testified to previously that he had phlebitis, can you or can you not testify that the condition may have contributed either wholly or in part to Mr. McDaniel's death? A. Yes. Q. For the benefit of the jury, would you explain to the jury just what you meant by that answer, yes? A. Well, I have to relate this whole thing to my experience and what I've learned, and we know that any patient who has had thrombophlebitis when subjected to conditions of being put to bed for any reason, or undergoing surgery for any reason, is more likely to reactivate his phlebitis under those circumstances. Q. This condition of thrombophlebitis that you've just testified to, is that a condition of a pre-existing disease; that is, pre-existing prior to the date that you began your treatment? A. Yes."

Dr. Christian, the pathologist who performed the autopsy, stated that the immediate cause of death was "attributed to right pulmonary thromboembolus." Upon cross examination, Dr. Christian testified: "Q. Based upon your experience, would you mind telling us what is phlebo thrombosis? A. Phlebo thrombosis is a condition usually of the veins of the lower extremities, and it involves a process in which the veins of the, for example, the lower extremities become dilated, and a blood clot becomes formed in these veins which is subject to breaking off and spreading to the lungs. Phlebo thrombosis is, we contrast this with thrombo phlebitis. Phlebo thrombosis which means blood clots in the veins for all practical purposes implies that there is a danger of spreading to the lungs with sudden death as opposed to thrombo phlebitis which is a rather common condition usually in women where the legs perhaps hurt more, but the very use of the term 'phlebo thrombosis' implies a danger of the spread of blood clots to the lungs. Q. Could an infirmity of phlebo thrombosis lead to a pulmonary emboli much like the pulmonary emboli that you saw in this deceased? A. Yes, it could."

"The Supreme Court, speaking through Mr. Justice Almand, in the *Prudential* case, supra, p. 459, quoted with approval Appleman, Insurance Law and Practice, Vol. 1, 494, § 403 (Now Vol. 1A, 76). '[W]here a diseased condition aggravates the result of the injury or is, itself, aggravated thereby, there can be no recovery, where the combined result is to cause the death or disability.' See *Johnson v. Aetna Life Ins. Co.,* 66 Ga. App. 629 (18 SE2d 777); *Overstreet v. Metropolitan Life Ins. Co.,* 69 Ga. App. 459 (26 SE2d 115); *Inter-Ocean Cas. Co. v. Scott,* 91 Ga. App. 311, 316 (85 SE2d 452); *Gulf Life Ins. Co. v. Braswell,* 101 Ga. App. 133, supra; *Miller v. Life & Cas. Co. of Tenn.,* 102 Ga. App. 655 (177 SE2d 237); 84 ALR2d 176, 203, 218 and cits." *Interstate Life &c. Ins. Co. v. Upshaw,* 134 Ga. App. 394, 397, supra, cert. den. The evidence in this case demanded a finding that McDaniel's pre-existing diseased condition aggravated or was aggravated by his injury and the ensuing surgery, and that the insurer was thus not liable for accidental death benefits under the policy. Accordingly, the trial court erred in refusing to direct a verdict in its favor.

*Judgment reversed. Deen, P. J., and Marshall, J., concur.*

ARGUED MARCH 3, 1977 —DECIDED MARCH 17, 1977 —
REHEARING DENIED MARCH 30, 1977 —

*McClure, Ramsay, Struble & Dickerson, John A. Dickerson,* for appellant.

*Adams & Clifton, Alton M. Adams,* for appellee.